ANTOINETTE THAYER WINTER, Appellee, *vs.* SARAH P. DIBBLE *et al.* Appellants.

*Opinion filed June 20, 1911—Rehearing denied October 14, 1911.*

1. MARRIAGE—*where celebration is shown, everything essential to validity of marriage is presumed.* Where the celebration of a marriage is shown, everything essential to the validity of the marriage, including the capacity of the parties, will be presumed; and if a prior marriage is shown, the death or divorce of the former spouse will be presumed, unless the contrary is proved by the party asserting the invalidity of the marriage.

2. SAME—*what does not tend to show that the wife was not divorced from her former husbands.* Mere proof that the wife had filed bills for divorce against each of her former husbands in a foreign State has no tendency to show she was not divorced from them; nor is any such inference to be drawn from the fact that upon a cross-bill seeking a discovery of the facts concerning the divorces the court sustained her demurrer, which was based upon the grounds that the allegations of the cross-bill were not sufficiently definite and that its object was to obtain evidence that her marriage was bigamous, which fact, if established, might lead to her indictment and punishment.

3. EVIDENCE—*what is not sufficient oral proof that document is a copy of an instrument.* The testimony of a witness, twenty-nine years after the casual reading of an instrument containing over a thousand words, who cannot remember the substance of the instrument but only the meaning of part of it, that he believes a document read to him is a copy of the original instrument, is not of that certain and satisfactory character of proof required to divest title to real estate.

4. SAME—*record of unacknowledged instrument proves nothing but notice.* The object of the recording laws in permitting unacknowledged instruments to be recorded is not to preserve evidence of title but to give notice of claim, which persons dealing with the land must heed; but the record proves nothing but notice.

5. SAME—*a certified copy of record of unacknowledged instrument does not prove contents.* A certified copy of the record of an unacknowledged instrument does not prove the contents of the instrument, where there is no proof of the execution of such an instrument and connecting the instrument executed with the one recorded.

6. SAME—*sections 35 and 36 of the Conveyances act relate only to acknowledged instruments.* Sections 35 and 36 of the Convey-

ances act relate to the same subject, and the object of both is to obviate the difficulties attending the introduction of secondary evidence of instruments which have been acknowledged or proved and certified in such a way that the originals would be admissible without any preliminary proof; but neither section includes unacknowledged or unproved instruments which might be recorded under section 31 of such act.

7. SAME—*what does not estop widow from denying instrument.* The widow is not estopped to deny the validity of an instrument purporting to be a lease to her husband by reason of the fact that the husband went into possession of the land and received the income, where the evidence does not show that the instrument in question was the one under which he went into possession and claimed an interest in the property.

8. SAME—*defendant incompetent to testify where complainant sues as devisee of deceased person.* Where the complainant in a partition proceeding sues as devisee of a deceased person the defendant is incompetent to testify against her, and testimony of such defendant, admitted over an objection based upon her incompetence, cannot be considered.

9. WILLS—*entire clause cannot be rejected except from absolute necessity.* Every word in a written instrument is presumed to have been placed there for some purpose and should be given effect in arriving at the testator's intention, and a construction which requires the rejection of an entire clause in the instrument will not be adopted except from absolute necessity.

10. SAME—*sole object in construing a will is to ascertain the testator's intention.* The sole object in construing a will is to ascertain the testator's intention, and to that end every word will be given force if possible and the language interpreted in view of the circumstances attending each case.

11. SAME—*rule that testator's intention must control is the supreme rule of construction.* Rules for the interpretation of wills have been announced by the courts and are observed, but all of them yield to the prime rule that the testator's intention must control unless contrary to some rule of law.

12. SAME—*when word "heirs" means children or heirs of the body.* In a clause following a devise for life to the testator's children subject to the prior estate of the widow, which reads, "but in case of the death of any one leaving heirs then the share of such deceased child, in equal portions, shall descend to his or her heirs," the word "heirs" is shown by the context to mean children or heirs of the body.

13. SAME—*when the word "heirs" means heirs generally.* In a clause reading, "and upon the death of my said children, or any of them, the property shall descend to their respective heirs in fee simple absolute," the word "heirs" must be presumed to have been used in its technical sense and as denoting heirs generally, and not children or heirs of the body.

14. SAME—*word used more than once does not necessarily have the same meaning.* While it is ordinarily presumed that a word used more than once in an instrument has the same meaning each time, yet this is only a presumption, and a technical word may be given its technical meaning in one place and in another a non-technical meaning clearly indicated by the context.

15. SAME—*when clauses refer to two distinct contingencies.* Where land is devised, subject to the widow's life estate, to the testator's children for life, only, "but in case of the death of any one leaving heirs, then the share of such deceased child, in equal portions, shall descend to his or her heirs, and upon the death of my said children, or any of them, the property shall descend to their respective heirs in fee simple absolute," the two clauses quoted refer to two distinct contingencies, the former to the death of a child during the widow's lifetime leaving children, and the latter to the death of a child after the death of the widow.

16. SAME—*presumption where death of first taker is coupled with an uncertain condition.* Where the death of the first taker is coupled with a condition which may or may not happen, the devise over will be presumed to refer to the death of the first taker at any time; but this presumption yields to a contrary intention shown by the will. (*Fifer* v. *Allen,* 228 Ill. 507, explained.)

17. SAME—*the word "but" indicates an exception to what has gone before.* The word "but," whether used as a conjunction or a preposition, indicates exception, and as a conjunction it is used as a connective of sentences more or less exceptive or adversative, marking opposition in passing from one thought to another.

18. SAME—*will construed as not creating a contingent remainder.* A devise of the testator's property to his widow for life and "at her decease" to the testator's children, as co-owners, for life, only, "but in case of the death of any one leaving heirs, then the share of such deceased child, in equal portions, shall descend to his or her heirs," does not create a contingent remainder in the testator's grandchildren, but means that at the widow's death each child is to have a life estate, except in case of the death of one leaving children, in which case such children will take in fee, as alternative beneficiaries, the share which the parent would have taken for life had he survived the widow.

19. SAME—*operation of rule in Shelley's case.* Under the operation of the rule in *Shelley's case*, if a life estate is granted and by the same instrument the remainder is limited to the heirs of the life tenant, the law declares the remainder to be to the life tenant and both estates vest in him.

20. SAME—*nature of estate to be given the heirs determines the application of the rule in Shelley's case.* It is the nature of the estate intended to be given to the heirs, whether by inheritance or otherwise, which determines the application of the rule in *Shelley's case.*

21. SAME—*heirs taking as heirs must take by descent and must take the ancestor's estate.* All heirs taking as heirs must take by descent and must take the estate of the ancestor, and hence a limitation to heirs by that name as a class, to take from generation to generation, requires the estate of inheritance imported by that limitation to vest in the ancestor.

22. SAME—*rule in Shelley's case is a rule of law, which overrides declarations to the contrary.* If a testator has used technical language which brings the devise within the rule in *Shelley's case,* no declaration, however positive, that the rule shall not apply, or that the estate of the ancestor shall not extend beyond the primary express limitation, or that the heirs shall take by purchase and not by descent, will exclude the operation of the rule or affect the result.

23. SAME—*when rule in Shelley's case applies.* Where land is devised to the widow for life and at her decease to the children of the testator, as co-owners, for life only, "and upon the death of my children, or any of them, the property shall descend to their respective heirs in fee simple absolute," the word "heirs" is used as a word of limitation and not of purchase, notwithstanding the words in "fee simple absolute," and under the rule in *Shelley's case* the children take the fee. (*Butler* v. *Huestis,* 68 Ill. 594, explained.)

24. SAME—*rule in Shelley's case does not apply if the word "heirs" is not used in its technical sense.* The rule in *Shelley's case* does not apply where it is clear that the word "heirs" is not used to describe the estate but is used in the sense of "children," or in a restrictive and non-technical sense to designate individuals to whom a distinct estate is given, and from whom, as its origin, the descent is thereafter to be derived, and not to include the whole line of inheritable blood of the ancestor and make him the stock of descent.

25. ESTOPPEL—*when parties are estopped to say that the decree should have been withheld.* Where, up to the time a draft of the decree is presented for approval, both parties have been calling

upon the court to exercise its jurisdiction by granting the relief respectively prayed by the parties in the bill and cross-bill for partition, neither party can complain that the court at that time overruled a motion to withhold the decree until the determination of a pending suit to set aside the will under which the parties derive title.

26. PRACTICE—*when party is not entitled to reversal because of want of proper parties.* Parties who deliberately and intentionally procure an adjudication ·to be made in the absence of persons who ought to have been made parties to a complete adjudication but who are not necessary parties to the immediate controversy and whose rights will not be affected by the decree are not entitled to have the decree reversed for want of proper parties.

27. SAME—*when an order of reference as to solicitor's fees is merely interlocutory.* An order referring a cause to the master for an accounting and to ascertain and report what is a reasonable sum for the necessary services of the complainant's solicitor in the cause is merely interlocutory and does not amount to an allowance of a solicitor's fee nor an adjudication that the complainant is entitled to one, and until the court allows or refuses to allow such fee its order is not subject to an appeal.

APPEAL from the Superior Court of Cook county; the Hon. WILLIAM FENIMORE COOPER, Judge, presiding.

ALBERT M. KALES, for appellants.

MORRIS ST. P. THOMAS, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The defendants have appealed from a decree of partition involving several parcels of real estate claimed by different titles and presenting distinct questions. Appellee claims as the widow and sole devisee of Samuel Blair Winter, who died in December, 1908, leaving no descendant, but leaving the appellants, his sisters, heirs surviving him. For more than a year preceding his death he was domiciled in Holland, Michigan, where he died, and shortly before his death he there executed a will devising all his property to the appellee. The will was admitted to probate in Michigan, and an authenticated copy was filed in the probate court of

Cook county in accordance with the provisions of the stat-
ute which relate to foreign wills. The appellee thereupon
filed the bill now under review for the partition of the
premises. The appellants soon after filed their bill against
the appellee to have the copy of the will set aside, canceled
and declared void on account of the want of testamentary
capacity of the testator and undue influence exercised upon
him. The court dismissed the latter bill upon demurrer, but
this decree was reversed, (*Dibble* v. *Winter,* 247 Ill. 243,)
the cause was remanded, and it was pending when the
decree was entered in the partition suit at the December
term, 1910.

It is the claim of the appellee, in accordance with which
the decree was rendered, that Samuel Blair Winter and his
two sisters, the appellants, were in his lifetime tenants in
common, in equal shares, of all the real estate mentioned in
the bill, and that the appellee succeeded, under his will, to
his title. The appellants, on the other hand, contend that
Samuel Blair Winter had only a life estate in the whole
of one parcel and in the undivided third of another, and
had, therefore, no interest in these two parcels which he
could devise. They also contend that the appellee was not
lawfully married to Samuel Blair Winter; that there is a
defect of parties defendant; that the entry of the decree
should have been postponed until the determination of the
suit to set aside the copy of the will and until claims against
the estate of Samuel Blair Winter have been barred, and
that the court erred in referring the cause to the master to
ascertain a reasonable solicitor's fee for the complainant.

Samuel Blair Winter and the appellee were married in
June, 1907, by a minister of a Congregational church, at
the home of the appellant Mrs. Dibble, in Chicago. Evi-
dence was introduced tending to prove that she had previ-
ously been married three times and that her former hus-
bands were living at the time of the last marriage. It is
insisted that the last marriage was not shown to be lawful

because the evidence does not show that the appellee was divorced from any of her husbands. The rule is well settled that where the celebration of a marriage is shown, everything essential to the validity of the marriage, including the capacity of the parties, will be presumed. If a prior marriage is shown, the death or divorce of the former spouse will be presumed, and the burden is on the party asserting the invalidity of the subsequent marriage because of the former, to show that the former spouse is living and has not been divorced, even though such burden imposes the proving of a negative. (*Potter* v. *Clapp*, 203 Ill. 592; *Cartwright* v. *McGown*, 121 id. 388; *Schmisseur* v. *Beatrie*, 147 id. 210; *Cole* v. *Cole*, 153 id. 585.) To sustain the burden thus imposed upon them, the appellants introduced evidence tending to show that the appellee instituted divorce proceedings against each of her husbands in Cleveland, Ohio. This, of course, has no tendency to prove that she was not divorced from them. The appellants filed a cross-bill, one of the purposes of which was to obtain a discovery from the appellee as to when and where any divorce suits to which she was a party had ever been pending. She demurred to this portion of the cross-bill because the allegations were not sufficiently definite and because it was obvious that the purpose of the appellants in seeking the discovery was to obtain evidence that the appellee's marriage to Samuel Blair Winter was bigamous, and if that fact were established the appellee might be subject to indictment and punishment. The court sustained the demurrer, and the counsel for the appellants seems to think that from this action in regard to the pleadings some inference should be drawn against the appellee in the hearing upon the evidence. We do not see any basis for this claim. There was no evidence tending to impeach the validity of the appellee's marriage.

The two parcels of property the title to which is drawn in question on this appeal were known as 417 and 421

Warren avenue, which will be referred to as the Warren
avenue property, and 905 and 907 West Madison street,
which will be referred to as the Madison street property.
Peter Winter, the father of Samuel Blair Winter, owned
the Madison street property in his lifetime, and it is the
claim of the appellants that he conveyed it to Samuel Blair
Winter for life after the death of Peter Winter and then
to the appellants, with certain gifts over. The appellee's
claim is that Peter Winter did not convey this property
but owned it at his death, and that it passed under his will
to Samuel Blair Winter and the appellants, in equal shares.
The questions in regard to the conveyance concern its exe-
cution, its contents and its construction, all of which are
in issue.

The instrument which is claimed to have the effect of
a conveyance was not produced at the hearing but was
sought to be established by secondary evidence, and a docu-
ment certified by the recorder of Cook county to be a copy
of an instrument recorded in his office was introduced in
evidence. It bore the date of November 20, 1880, pur-
ported to be signed by Peter Winter and Samuel Blair
Winter and to be witnessed by Isaac Winter, though it was
not acknowledged, and was filed for record on Septem-
ber 29, 1883, twenty days after the death of Peter Winter.
It occupies four pages of the printed abstract, and is in
the form of a lease by Peter Winter, of the first part, to
Samuel Blair Winter, of the second part, of the Madison
street property from the day of the death of the party of
the first part, in the year 1870, to the day of the death of
the party of the second part, in 1870. It provides that the
"party of the second part is to pay all taxes and assess-
ments and keep the property in good repair, and the rents
of the above 905 and 907 West Madison street to be used
for the support and maintenance of Samuel Blair Winter
so long as he may live. After his death the rest of the
property 905-907 West Madison street shall be equally di-

vided between my daughters, Mrs. Sarah P. Dibble and Es-
tella Winter, or if they should die, or either of them, then
each one's share to go to their children, if any, or either
die *die* without heirs, the surviving heirs to have the income
by complying with the requirements of this lease." Then
follow about three pages of covenants and agreements en-
tirely inappropriate to a deed conveying a life estate or fee
and meaningless in that connection but of such a character
as are frequently found in leases.

That an instrument relating to this Madison street prop-
erty was executed by Peter Winter and Samuel Blair Win-
ter about the time of the date of this instrument and
delivered to Samuel Blair Winter is proved by the testi-
mony of Isaac Winter. An instrument relating to this
Madison street property purporting to be executed by Peter
Winter and Samuel Blair Winter was filed for record in
the recorder's office of Cook county on September 29, 1883,
and there recorded. But the evidence fails to show that
these two are the same instrument. The deposition of
Isaac Winter, the attesting witness, was taken in the spring
of 1910,—twenty-nine years after the instrument was ex-
ecuted, when he was eighty-nine years old. He testified
that he remembered being a witness to an instrument in
November, 1880, between Samuel Blair Winter and Peter
Winter,—a lease of the Madison street property. The lease
was to go to Blair Winter and the rent of these shops after
his father's death, then the rents were to go to Sarah P.
Dibble and Estella Winter; that it was a long instrument,
written on one sheet with a pen, but not in the handwriting
of either Peter Winter or Samuel Blair Winter. When the
recorder's copy was read over to him he said he believed
it was a copy of the lease referred to, but on cross-exami-
nation said that he could not tell about that; that all he
remembered about the lease was the part that was to go
to Blair and the girls, the way he understood it; that all
he remembered was that Blair was to draw after Peter's

death; that it should go to Estella Winter and Sarah Dibble—the rents of the shops were to go to them; that when they died he did not remember exactly what was to become of it or whether the lease said anything about that or not. He said that he remembered the meaning of the lease and that was about all,—he could not remember the language; that he had read the lease but was uncertain whether he had read all of it; that he had not seen or thought of it since 1881, when Samuel Blair Winter had it; that it was delivered to Samuel Blair Winter when Peter Winter signed it. No other witness who had ever read the instrument testified about it.

The testimony of a witness twenty-nine years after the casual reading of an instrument containing a thousand words or more, who cannot remember the substance of the instrument but only the meaning of part of it as he understood it, and that he believes a document read to him is a copy of the original instrument, is not of that certain and satisfactory character required to divest titles to real estate. "To prove the contents of a written instrument the vague recollections of witnesses are not sufficient to supply its place. The substance of the contract ought to be proved satisfactorily, and if that cannot be done, the party is in the condition of every other suitor in court who has no witness to support his claim. When the parties reduce their contract to writing, the obligation and duties of each are described and limited by the instrument itself. The safety which is expected from them would be much impaired if they could be established upon uncertain and vague impressions of witnesses." *Rankin* v. *Crow,* 19 Ill. 626.

The appellant Mrs. Dibble testified that immediately after the death of Peter Winter, Samuel Blair Winter had the lease in his possession; that he then delivered it to Mr. Dibble, her husband, to be recorded; that Mr. Dibble had it recorded and kept it until his death, when Mrs. Dibble found it in his papers and delivered it to her brother.

251 — 14

Mrs. Dibble never saw the instrument in her father's lifetime and does not say that she ever read it. She is therefore unable to identify the instrument given by her brother to her husband as the instrument executed by her father and witnessed by Isaac Winter.

The certified copy of the instrument recorded in the recorder's office was not evidence of the contents of the instrument executed by Peter Winter. All instruments of writing relating to real estate may be recorded, and from the time of filing for that purpose they constitute notice to subsequent purchasers and creditors, whether acknowledged or proved according to law or not. The record of unacknowledged and unproved instruments is not, however, available as evidence for any other purpose than to show notice. The object of the recording laws in permitting such unproved instruments to be filed is not to preserve the evidence of title but to give notice of claim. The record does not prove anything. It only gives warning which persons dealing with the land must heed. The statute provides that the acknowledgment of deeds and other instruments relating to real estate by the parties, or the proof of their execution in the manner mentioned in the statute, may be certified by certain officers authorized for that purpose, and that when so acknowledged or proved, whether recorded or not, they may be read in evidence without further proof of execution. If recorded, the record does not become primary proof but may be resorted to only as secondary evidence upon its appearing, to the satisfaction of the court, that the original deed so acknowledged or proved and recorded is lost or not in the power of the party wishing to use it, in which case the record, or a transcript thereof, certified by the recorder, may be read in evidence. This is the provision of section 35 of chapter 30 of the Revised Statutes of 1874, and it cannot be plausibly insisted that the certified copy is admissible under this section, for it expressly applies only to deeds "acknowl-

edged or proved according to the provisions of this act," and the only method of proof, according to those provisions, is by a witness whose testimony is certified to by the officer taking the proof.

It is, however, argued that the certified copy is admissible under section 36 of chapter 30, because that section refers to instruments "acknowledged or proved according to any of the laws of this State" instead of "according to the provisions of this act," and it is said this instrument has been proved by the attesting witness, which is "according to the laws of this State." Disregarding the assumption thus made of the whole matter at issue, (for if the instrument has been proved by the attesting witness there is no occasion for further discussion on this point,) the assumption that the difference in the language of these two sections in the particular mentioned creates any different rule as to the application of the two sections is unwarranted. Section 35 of chapter 30 has been the law of this State since 1827, when it was enacted, substantially as it now reads, as section 17 of "an act concerning conveyances of real property." Under this section this court held that in order to admit certified copies of the instrument mentioned in evidence it was necessary to make strict proof of the existence of the original, its loss, diligent search, and of all the requirements of the common law for the admission of secondary evidence. (*Dickinson* v. *Breeden,* 25 Ill. 186.) In order to obviate this construction, relax the rule laid down by the court and modify the strictness of the common law rule, the legislature in 1861 passed an act which, with a slight change, became sections 36 and 37 of chapter 30 of the Revised Statutes of 1874. (*Deininger* v. *McConnel,* 41 Ill. 227; *Fisk* v. *Kissane,* 42 id. 89; *Nixon* v. *Cobleigh,* 52 id. 387.) This act was dealing with precisely the same subject as section 35, and the object of both was to obviate the difficulties attending the introduction of secondary evidence of instruments which had been acknowl-

edged or proved and certified in such a way that the origi-
nals would be admissible without any preliminary proof.
The act had nothing to do with the subject matter of sec-
tion 31, and was not intended to include in its provisions
the miscellaneous, unacknowledged and unproved docu-
ments and papers which might, under the provisions of that
section, be recorded and constitute notice, but for the read-
ing in evidence of which documents and papers, or the rec-
ord thereof, neither that section nor any other made any
provision. Section 35, when passed in 1827, was a part
of the act which provided for the acknowledgment and
proving of deeds, and therefore mentioned the instruments
to which it referred as those "acknowledged or proved ac-
cording to the provisions of this act." Section 36 did not
purport to be a part of any other act, and this accounts for
the different language, "acknowledged or proved accord-
ing to any of the laws of this State," in which it refers to
instruments of the same character as those mentioned in
section 35. This difference in language does not require
or justify any difference in the construction of the two sec-
tions. The statute does not authorize the reading in evi-
dence of the record of a deed not acknowledged or proved
as provided in chapter 30 of the Revised Statutes,—and
this conclusion is supported, inferentially, by the statement
of the court in a case where a certified copy of the record
of a deed was admitted, that "this evidence fulfilled the
conditions of this statute, the lease having been properly
acknowledged and recorded in the proper office." (*Pretty-
man* v. *Walston,* 34 Ill. 175.) The certified copy read in
evidence by the appellants was not evidence of the contents
of the instrument executed by Peter Winter. The evidence
connecting the instrument executed with the instrument re-
corded is not satisfactory, nor is the evidence that Samuel
Blair Winter caused this instrument to be recorded. The
evidence of the contents of the instrument executed by
Peter Winter other than the record is altogether unsatis-

factory. So the claim that the appellee is estopped to deny this instrument because Samuel Blair Winter went into possession under it, collected the rents and received the benefit of it during his lifetime is unfounded. While he collected the rents and claimed an interest in the property during his lifetime, the evidence fails to show that he did so under this instrument.

Appellants introduced in evidence a blue-print which Mrs. Dibble testified was a *fac simile* of the instrument. Its appearance in the case is not very satisfactorily explained. Mrs. Dibble testified before the master on April 21, 1910. She could not remember ever having seen the lease in her father's lifetime but saw it in her brother's possession immediately after the former's death. After her husband's death she found it in his safety deposit box and gave it to her brother. She had seen the original very many times and had it in her possession. It was written on several sheets of paper,—probably as many as six,—and was all written out in longhand. On May 26 Mrs. Dibble was again a witness before the master. A paper was put in her hands and she testified that it was a *fac simile* of the original lease of the Madison street property; that she was perfectly familiar with the original lease; that it was in her hands and she certainly was familiar with it; that the lease proper was printed and then her father filled it in; that it was all filled in with his writing, with which she was perfectly familiar. The blue-print shows a printed form of lease, with blanks containing writing. It shows the signature of Peter Winter but not either that of Isaac Winter or Samuel Blair Winter, as does the certified copy of the recorder. Mrs. Dibble gives no explanation of the discovery of the blue-print, whence, when, where or how it came into her possession, whether she had it or had seen it when she testified five weeks before, who made it, under what circumstances, or what it was made from. Neither does she attempt any explanation of the versatility of her

memory, which seems to respond readily to the exigency of the occasion. She seems to be as certain in May that the lease was written on the single sheet of a printed blank form as she was in April that it was all written in longhand, covering half a dozen sheets, but no more so. Without questioning her good faith, it seems impossible to repose implicit confidence in her accuracy and the fidelity of her memory under the circumstances. Isaac Winter also testified that the lease was written with a pen but not in the handwriting of Peter or Samuel Blair Winter, and that both he and Samuel Blair Winter signed it as well as Peter Winter, yet the blue-print shows no signature but that of Peter Winter. It may be said of the testimony of Mrs. Dibble that substantially all of it was incompetent because the appellee was suing as the devisee of a deceased person. Most of it was received, however, without objection, but her testimony in regard to the blue-print was objected to on account of her incompetence and should not have been considered. Without it there was no foundation for the introduction of the blue-print. On the whole, the blue-print is not sufficiently authenticated to carry any weight.

It is also insisted that Joanna O. Winter, the widow of Peter Winter and executrix of his will, to whom he devised all his property for life, in the inventory of his estate (which she filed in the probate court) recognized the recorded instrument as valid and the instrument executed by Peter Winter. The item referred to, in setting out the title to the Madison street property, which is inventoried as a part of the estate, mentions "a paper purporting to be a life lease of said property, bearing date November 20, 1880, and signed by Peter Winter, to S. B. Winter and others, recorded September 29, 1883, in the recorder's office of Cook county, Illinois, in book 1376 of records, page 238." This was no recognition of the validity of the instrument but rather a mere acknowledgment of the existence of a record purporting to affect the title.

The appellants insist that they were not called upon, under the pleadings, to prove the contents of the instrument because the bill has attached to it as an exhibit an exact copy of the recorded instrument, and, as appellants claim, admits that it is a copy of the original instrument and makes no objection to it, except it is charged that there was no delivery of it in the lifetime of Peter Winter. The averments of the bill in regard to this instrument are, that the appellee had been informed a certain instrument had been discovered among Peter Winter's papers after his death and had been filed for record and recorded, and a copy of the instrument as so recorded was attached to the bill as an exhibit, and upon information and belief that the instrument never was delivered and for that reason never became operative. The answer averred that the instrument was delivered and became effective; that under it Samuel Blair Winter entered into possession of the premises and collected and appropriated the rents to his own use, and that thereby he and those claiming under him were estopped to deny the validity of the instrument. The issues on which the cause was submitted were not confined to the bill and answer, for a cross-bill was filed by the appellant Estella W. Gair, in which the execution and delivery of the instrument of November 20, 1880, were averred. The appellee answered the cross-bill, setting up, as in her original bill, the information which she had received in regard to this supposed instrument, but expressly stating that she had no personal knowledge as to the truth of such information and did not make any representation or admission in respect thereto, but left the cross-complainant to make such proof as she might be advised in respect of the execution and delivery of the said supposed instrument. Under these pleadings there was no admission in regard to the instrument in controversy, but all questions in regard to its existence, identity, execution and contents were left for determination by evidence.

We are satisfied with the conclusion of the chancellor that the instrument of November 20, 1880, was not established by the evidence.

By his will Peter Winter devised all his real estate, so long as she should remain his widow, to his wife, whom he nominated executrix, with power to sell a part of such real estate. She died not having re-married. The remainder in the Warren avenue property passed by the following clause in the will: "My real estate in Chicago is not to be sold nor encumbered by my executrix, but in case of her marriage, then, subject to her marital rights as my widow or at her decease, * * * my real estate which I now own in Chicago is to be held, owned and used by my said children, as equal co-owners, for and during the full period of their several natural lives, but in case of the death of any one leaving heirs, then the share of such deceased child, in equal portions, shall descend to his or her heirs, and upon the death of my said children, or any of them, the property shall descend to their respective heirs in fee simple absolute." This language manifested the testator's intention to give to each of his three children, subject to the life estate of his widow, an estate for life, and for life only, in one-third of the real estate he owned in Chicago at the date of the will. The two clauses which follow this gift, "but in case of the death of any one leaving heirs, then the share of such deceased child, in equal portions, shall descend to his or her heirs," and "upon the death of my said children, or any of them, the property shall descend to their respective heirs in fee simple absolute," do not in any way qualify or affect the life estates so given. They refer to two distinct contingencies which may arise, unless, as suggested by counsel for appellants, the second clause be regarded as mere repetition, by way of special emphasis of what was said in the first. It cannot, however, be so regarded, for it is a rule frequently referred to in the interpretation of written instruments that the in-

tention must be ascertained from a consideration of the
whole instrument; that every word in the instrument is
presumed to have been placed there for some purpose and
must be given effect in arriving at the intention, and that
none can be arbitrarily rejected as meaningless or surplus-
age. A construction which requires the rejection of an en-
tire clause in an instrument is not to be admitted except
from absolute necessity. *City of Alton* v. *Illinois Trans-
portation Co.* 12 Ill. 38; *Mittel* v. *Karl,* 133 id. 65.

The sole object of construction of a will is to ascertain
the intention of the testator. That intention will be en-
forced unless it violates some rule of law. In seeking it
every word will be scrutinized and given force, if possible.
The language will be interpreted in view of the circum-
stances attendant upon each case, and the variety of lan-
guage and of circumstances is so great that precedents are
usually of little value. Rules of interpretation have been
announced and are observed, but all yield to the prime rule
that the intention of the testator must control. The gen-
eral scheme of Peter Winter's will is not complex. Dis-
regarding details not material here, it was to provide for
his wife by giving to her the use, rents and profits of all
his estate during her life; then for his children by giving
them, among other things, after his wife's death, his Chi-
cago real estate for life, only; then to give the fee ulti-
mately to the heirs of his children. The first question arises
out of the clause, "in case of the death of any one leaving
heirs." The parties do not disagree that the word "heirs"
here means children or heirs of the body, and such must
be its meaning. (*Bradsby* v. *Wallace,* 202 Ill. 239.) They
do differ, however, as to the time to which the words re-
ferring to the death of any of the children relate. The ap-
pellants insist that they refer to death at any time and that
the children of the appellants now living have a contingent
interest in the property in which the parents have a life es-
tate only, while the appellee insists that the words refer to

death in the lifetime of the widow, and that the children having survived her, the contingency no longer exists.

The appellants rely upon the rule laid down in *Fifer v. Allen,* 228 Ill. 507, and other cases, that when a devise is made to one in fee and in case of his death to another in fee, the devise over will be interpreted as referring to death in the testator's lifetime, only, but when the death of the first taker is coupled with a condition which may or may not occur, as death during minority or leaving no children, the devise over, unless controlled by the context, will be interpreted as referring to death at any time. Those were all cases of conditional fees, where, by an executory devise, the estate in fee of the first taker was terminated and another fee limited in place of it, and do not, in terms, apply to the case in hand. Whether the rule applies, in principle, to this case or not, it is only a presumption, which yields to a contrary intention shown by the will. The testator here has sufficiently indicated the period for the final ascertainment of the interests vesting under his will as the death of his wife. Then it is that his children come into possession of their life estates. The parenthetic clause does not affect the estates, but provides for the contingency of a child's death occurring before the widow's by substituting an estate in fee to such child's children for the life estate given the child which cannot come into possession. The clause is introduced by the word "but," which indicates an exception to what has gone before, and not by the word "and," which would indicate a continuation of the same subject. "But," whether used as a conjunction or a preposition, indicates exception. As a conjunction it is used as a connective of sentences more or less exceptive or adversative. It marks opposition in passing from one thought to another. It is defined, "except," "unless," "save," "yet," "still," "however," "nevertheless." (Webster's New Int. Dict.; Century Dict.) In the present instance it excepts the case mentioned in the clause it introduces from the op-

eration of the preceding clause. The preceding clause provides that at his wife's decease the real estate shall be held, owned and used by testator's children, as tenants in common, during their natural lives. The time to which it refers is "at her decease." The exception refers to the same period. It does not refer to a death occurring after her decease. In such case there would be no exception from the preceding clause, for the life estate would have been enjoyed to the same extent as if the exception had not been introduced. The meaning is, that at the wife's decease each child shall have a life estate, except in case of the death of one leaving children, in which case his or her children shall take in fee the share the parent would have taken for life. This construction, that the intention of the testator was not to create a contingent remainder but to provide that the issue of any of his children dying before his wife should be alternative beneficiaries of the shares of their parents, is further supported by the fact that what is devised over is the "share of such deceased child," the natural meaning of which is an undivided portion of the estate while it existed as his estate, and not many years after distribution, as might probably be the case. (*Lampkin* v. *Lampkin,* 108 Md. 470; *Galloway* v. *Carter,* 100 N. C. 128; *Fairfax* v. *Brown,* 60 Md. 50.) In the subsequent clause, where the reference is to the remainder after the distribution of the life estate, the testator uses the word "property" and not "share." In fact, all the children survived the widow, so that the clause referring to "death leaving heirs," as we have construed it, has no effect upon the estates created by the will, but the will is to be construed as though it devised to the three children life estates as tenants in common, "and upon the death of my said children, or any of them, the property shall descend to their respective heirs in fee simple absolute." The question is presented whether the rule in *Shelley's case* is applicable to this language. Under the operation of that rule, if a life estate is granted and

by the same instrument the remainder is limited to the heirs of the life tenant, the law declares the remainder to be to the life tenant and both estates vest in him. *Bails* v. *Davis,* 241 Ill. 536.

It is argued, first, that the word "heirs" means "heirs of the body," and it is so argued because the same word in the preceding clause admittedly means "heirs of the body." Ordinarily it will be presumed that a word used more than once in an instrument has the same meaning each time. This is, however, only a presumption. Technical words are presumed to be used according to their technical meaning, and will be given that meaning unless it clearly appears that they were not used in that sense. The word "heirs" in the prior clause is construed "children" or "heirs of the body" because the context makes it certain that no other meaning could have been intended. The two clauses do not concern the same thing, the first referring to the case where no life estate has come into possession, the second to the disposition of property after the termination of the life estate. The word is used in such different connection in the two cases that its use as "heirs of the body" in the one case does not require it to be given other than its technical meaning in the other.

It is also insisted that in the second clause the word "heirs" means collateral heirs, being contrasted with "heirs" in the first clause meaning "heirs of the body." Under our construction these clauses are not related, but the "heirs" referred to in the second clause are the general heirs.

It is next insisted that the words "in fee simple absolute" show that the word "heirs" was used as a word of purchase and not of limitation, and that, therefore, the rule in *Shelley's case* does not apply. The effect of the rule where it applies is, that the law declares the remainder expressed to be to the heirs, a remainder to the ancestor. One taking in the character of heir must take in the quality of heir, and all heirs taking as heirs must take by de-

scent and must take the estate of the ancestor. The limitation to heirs by that name as a class, to take in succession from generation to generation, requires the estate of inheritance imported by that limitation to vest in the ancestor. It is the nature of the estate intended to be given to the heirs, whether by inheritance or otherwise, which determines the application of the rule. (*Baker* v. *Scott,* 62 Ill. 86; *Vangieson* v. *Henderson,* 150 id. 119; *Ward* v. *Butler,* 239 id. 462; *Bails* v. *Davis, supra.*) The ordinary form of a conveyance of a fee at common law was to the grantee and his heirs. A conveyance to the grantee alone gave a life estate, only. The added words, "and his heirs," indicated a fee simple. The word "heirs" was not used to describe the persons who were to take the estate after the grantee's death, but the quality of the estate granted, which was a fee. The estate granted was not different if given to the grantee for life with remainder to his heirs. The addition to the ordinary formula for granting a fee, of the words "for life," was regarded merely as an effort to restrict the grantee's enjoyment of the fee granted to him by restraining his power of alienation, and the law would not permit this to be done. The word "heirs" had therefore, long before *Shelley's case* arose, been regarded as a word descriptive of the estate and not of the person, and the rule called by Shelley's name was merely the announcement of a legal principle which had then been applied by the courts for more than two hundred years. The rule as stated by Coke (vol. 1, 104*a*,) is, that "when the ancestor by any gift or conveyance takes an estate of freehold, and in the same gift or conveyance an estate is limited, either mediately or immediately, to his heirs in fee or in tail, that always in such cases 'the heirs' are words of limitation of the estate and not words of purchase." This is a rule of law and not of construction, and the use of the word "heirs," unless it clearly appears from the instrument to have been used in a sense different from its strict legal

meaning, is conclusive of the intention. No declaration, however positive, that the ancestor shall be tenant for life and no longer, and shall have no power to sell or dispose of the premises or any part of them, or to defeat the intention of the testator, will prevent the application of the rule. (*Lord* v. *Comstock,* 240 Ill. 492; *Deemer* v. *Kessinger,* 206 id. 57; *Hageman* v. *Hageman,* 129 id. 164; *Carpenter* v. *VanOlinder,* 127 id. 42.) If a testator has used technical language which brings the case within the rule, a declaration, however positive, that the rule shall not apply, or that the estate of the ancestor shall not continue beyond the primary express limitation, or that his heirs shall take by purchase and not by descent, will be unavailing to exclude the rule and cannot affect the result. (*Daniel* v. *Whartenby,* 17 Wall. 639; Hargrave's Law Tracts, 562; 2 Jarman on Wills, 311.) A grantor or testator may use the word "heirs" in the sense of "children," and if it clearly appears to have been so used the rule will not apply, because it then appears that the word was not used to describe the estate granted but the persons who should take the estate. Whenever it is made to appear by the language of the instrument that the words of inheritance were not used according to their legal import, to include the whole line of inheritable blood of the ancestor and to make him the stock of descent, but have been used in a restrictive and untechnical sense, to designate individuals to whom a distinct estate is given and from whom, as its origin, the descent is thereafter to be derived, the rule will be excluded. The words relied upon here, "in fee simple absolute," in no manner affect the meaning of "their respective heirs." Without those words "the heirs" would imply a fee simple; with those words they mean nothing else. There is no doubt of the intention of the testator to give to his children a life estate only, and not an estate in fee. It is equally manifest that he intended their heirs to take precisely the estate which they would have inherited from their

parents. There is nothing in the language to indicate that he intended the heirs to take it in any other way than as heirs. This is the exact situation which calls the rule into operation. The devise is to each child for life, remainder to his heirs. The words "in fee simple absolute" add nothing to the meaning. They do not indicate that the heirs shall take their fee simple estate otherwise than as heirs.

Our attention has been called to various cases where words of limitation or of explanation added to the words "heirs" or "heirs of the body" have been held to qualify those words so as to show that they were not used in their technical sense but as meaning "children" or "issue" or the persons who might be heirs at a particular time, or as describing in some other way the particular persons to whom the estate should go. In such cases the rule does not apply.

In *Butler* v. *Huestis*, 68 Ill. 594, the appointment was to Altieri A. Huestis during her natural life, "the reversion and fee thereof to the heirs of her body at and after her decease." The court stated that the rule in *Shelley's case* can operate in this State only in the one case where a devise gives the ancestor a freehold for life and limits the inheritance in fee to the heirs without naming any particular class, and that therefore the court was under no imperative necessity to regard the words used in the will, "heirs of the body," as words of limitation rather than words of purchase. It was held that the words "heirs of the body," as employed in the will, might be regarded simply as words of description, designating the children of Mrs. Huestis as the persons who should take the fee of the estate, and the only words upon which this proposition was based were "at and after her decease," the court saying: "The very fact the enjoyment of the estate is postponed until 'at and after the decease' of Mrs. Huestis, and then becomes absolute, shows beyond doubt the testatrix did not use the words 'heirs of her body' in the common law sense of words of limitation, to indicate a class of persons to take from gener-

ation to generation." The decision reached in that case was inevitable, for the only question in the case was whether the appointment to Mrs. Huestis disposed of the fee; and whether the words were to be regarded as words of limitation, which would create an estate in tail at common law, which the statute would turn into an estate for life in Mrs. Huestis with a remainder in fee simple absolute to the heirs of her body, or mere words of purchase, which conveyed the remainder, after her life estate, to her children in fee simple, the result was the same so far as the fact of the disposition of the fee was concerned. Whether the fact that the enjoyment of an estate in remainder expectant upon the termination of the natural life of a preceding tenant was postponed until "at and after the decease" of such life tenant could throw any light upon the intention that the remainder-men should take by inheritance or purchase, or not, this case is no authority, direct or indirect, for the proposition that the addition of the words "in fee simple absolute" to a remainder devised to "heirs" qualified the latter word so as to require it to be regarded as a word of purchase and not of limitation. Words added cannot be said to qualify an expression if the expression means the same thing with the words added as without.

In *Fowler* v. *Black,* 136 Ill. 363, it is expressly stated that the declaration in a deed that it was the true intent and meaning of the instrument that the grantee should hold only during his natural life and upon his death the premises should be held in fee simple by his heirs, was wholly ineffectual to make the word "heirs" a word of purchase.

The case of *Westcott* v. *Meeker,* 144 Iowa, 311, is also cited by counsel for appellants. The Supreme Court of Iowa had held in *Doyle* v. *Annis,* 127 Iowa, 36, (a case involving the construction of a deed,) that the rule in *Shelley's case* was a part of the common law of that jurisdiction. In *Westcott* v. *Meeker, supra,* which involved the construction of a will, it was held that the rule should

not be so applied to a will as to defeat the manifest intention of the testator in respect to the estates devised. The will in question devised the estate to children during their natural lives, with "no power to convey or dispose of the same, their respective portions, for a longer time than during their natural lives, respectively. At the death of my children aforesaid, their respective portions * * * descend to their heirs, respectively, said heirs to have absolute title unto their respective portions." Of course, the intention of the testator that his children should have no more than a life estate and that the title should descend to their heirs was manifest, and it was held that the will should be construed according to the intention, without regard to the rule in *Shelley's case*. The effect of these two decisions was, that until the recent abolition of the rule in Iowa by statute, the rule in *Shelley's case* was in force in that State as to deeds but not as to wills. No such distinction prevails elsewhere, to our knowledge, and certainly not in this State. (*Lord* v. *Comstock, supra; Hageman* v. *Hageman, supra; Carpenter* v. *VanOlinder, supra.*) In the latter case the language of the opinion in *Belslay* v. *Engel,* 107 Ill. 182, is expressly disapproved in so far as it seems to place the decision upon the intention of the testator as determined from a consideration of all the language of the will, and not upon his evident intention to use the words "legal representatives" or "legal heirs" as synonymous with "children," and, therefore, as words of purchase and not of limitation.

It is insisted that the decree must be reversed for want of necessary parties, viz., the children and grandchildren of the appellants, who would have an interest in the property under the instrument of November 20, 1880. It is also insisted that no decree should have been rendered until the determination of the proceeding to set aside the copy of the will of Samuel Blair Winter and until the debts of his estate have been barred in this State. The appellants filed

a cross-bill, in which they claimed to be the owners of the property involved in this proceeding, subject to the contingent interest, in a part thereof, of their children and grandchildren, who were made parties to the cross-bill but not served with process. By this cross-bill the appellants sought to have a partition of the premises. On motion of the complainant the original bill, being at issue, was referred to a master in January, 1910, but the cross-bill, for want of service on some of the defendants, was not then at issue. No summons, either before or after that time, was issued on the cross-bill, but in April following it was dismissed by the complainants therein as to their children and grandchildren, and on their motion the order of reference theretofore made was extended to the cross-bill. Thereafter the bill and cross-bill were prosecuted by the respective complainants in the usual way and were brought to a hearing together. No objection was made by any party to proceeding for want of parties. The administration of Samuel Blair Winter's estate was had presumptively in the State of Michigan, and there is no intimation that there were any debts which were likely to become chargeable upon his real estate in Illinois. The pendency of the suit to set aside the copy of Samuel Blair Winter's will was never brought to the attention of the court in any way until the hearing on exceptions to the master's report, when counsel for the appellants, in argument, questioned the right and propriety of entering a final decree until the other suit was disposed of, and stated that the latter matter would have to be determined before a decree could be entered in the pending cause. After the hearing had been concluded and the court, having held the cause under advisement for two weeks, had announced its decision, and when, two weeks later, a draft of the decree had been presented to the court for approval, counsel for the appellants entered a motion to withhold the entry of the decree until after the determination of the other case. Up to this time both

the appellants and the appellee had been prosecuting the cause, calling upon the court to exercise its jurisdiction, to grant the relief they were respectively seeking, and to make partition of the premises. If the court ought not to have heard and adjudicated the cause, it was induced to do so by the joint efforts of all the parties, and none of them can now complain that the court did what it was asked to do. If there are interests which were not represented they are not bound by the decree. The execution of the decree will not affect such interests. If, in a contested cause, parties knowingly choose to submit their rights in the absence of others who ought to be parties to a complete adjudication but are not necessary parties to the immediate controversy and whose rights will not be affected, a party who has deliberately and intentionally procured the adjudication to be made in the absence of such parties cannot have it reversed because they were not before the court.

By the decree the cause was referred again to the master in chancery for an accounting, and among other things it was ordered that the master, to enable the court to arrive at a basis for apportioning the costs, including a reasonable solicitor's fee, should ascertain and report, in accordance with the practice in such cases, what is a reasonable sum for the necessary services of the complainant's solicitor in the cause. It is contended that the appellee is not entitled to any allowance against the estate for solicitor's fees. No allowance has been made to the appellee nor has it been adjudicated that she is entitled to any. It may never be so adjudicated. The reference for an accounting and the ascertainment of a solicitor's fee is merely interlocutory. (*Jones* v. *Young,* 228 Ill. 374; *Glos* v. *Clark,* 199 id. 147.) Upon the coming in of the master's report the court may either allow or refuse to allow a solicitor's fee. Until such action of the court its order is not the subject of appeal.

*Decree affirmed.*