Martha Cardenas, Appellant, v. Trinidad Cardenas, Appellee.

**Gen. No. 46,929.**

First District, Second Division.
December 27, 1956.
Rehearing denied January 15, 1957.
Released for publication March 5, 1957.

Joseph B. Gilbert, of Chicago, for appellant.

Eugene Propp, of Chicago, for appellee.

JUDGE SCHWARTZ delivered the opinion of the court.

The primary question presented to us on this appeal is whether a court of equity, having entered a decree of annulment of a marriage, has jurisdiction with respect to matters relating to the care and custody of a minor child. It is a matter of first impression in Illinois.

On August 27, 1954, plaintiff filed a suit for separate maintenance, later amended to divorce, alleging that she had been married in Chicago, January 6, 1949, and charging defendant with cruelty and failure to support. In an answer filed September 20, 1954, defendant denied the charges, and on April 1, 1955, filed a coun-

terclaim charging that plaintiff had entered into an earlier marriage in Mexico in June 1940 which was not dissolved until February 9, 1949, a little over a month after plaintiff and defendant had entered into their marriage. The counterclaim prayed for annulment or divorce and for the custody of a minor child born during their alleged marriage. That portion of the counterclaim praying for divorce was stricken upon order of the court August 8, 1955, and on September 30, 1955, the court entered a decree dismissing plaintiff's complaint for want of equity, decreeing annulment of the marriage as prayed in the counterclaim, and declaring that the child of the parties was and shall continue to be legitimate. On December 8, 1955, defendant petitioned the court for an order declaring his rights and duties concerning the minor child. On January 23, 1956 a motion by plaintiff to strike the petition was denied. Plaintiff electing to stand on her motion, the court entered an order granting defendant the right of visitation and ordering him to pay $12.50 per week for the support of the child. It is from this order that the appeal is taken by plaintiff, who does not desire the support money and is opposed to defendant's having a right of visitation.

Plaintiff contends that no order respecting child care and custody can be entered in an annulment suit and relies on three cases, Thomas v. Thomas, 250 Ill. 354, 360; Bateman v. Bateman, 337 Ill. App. 7, 17; and Luczynski v. Luczynski, 327 Ill. App. 548, in support of her position.

In Thomas v. Thomas, supra, the defendant had filed a cross bill solely for the purpose of obtaining the care and custody of two children. The court overruled a demurrer to the cross bill and the plaintiff electing to stand by her demurrer, the cross bill was taken as confessed. The plaintiff moved the trial court to dismiss her bill of complaint, which the court denied.

500

On appeal, the Supreme Court held that the bill for divorce should have been dismissed when the plaintiff so moved, and nothing would then remain but the cross bill seeking the care and custody of the children. This standing alone could not, the court said, be made the basis for equitable jurisdiction. Mr. Justice Carter dissented, relying upon the early case of Cowls v. Cowls, 3 Gilman 435 (1846). The other two cases cited by plaintiff follow the Thomas case.

These cases do not constitute a precedent for plaintiff's position. They are authority only for the proposition that an order with respect to child care and custody cannot be entered where there is no decree affecting the marital status of the parents. Even to that extent they have not been adhered to literally, Cowls v. Cowls, supra, being quoted with approval to support the contrary position. In Parker v. Parker, 335 Ill. App. 293 (1948) the parents had been divorced in Indiana and custody of the child granted to the mother, but as the father was outside the jurisdiction of the court and was served by publication, no order for support was entered. Thereafter a petition in equity was filed in Illinois (where personal service was had on the father) on behalf of the child by the mother as next friend, solely for the purpose of requiring a contribution to support. The trial court held that a court of equity could not take jurisdiction of a petition for the support of a minor child except as incidental to a suit for divorce. The Appellate Court (citing Cowls v. Cowls, supra) reversed the order and directed the trial court to hear the petition on its merits.

 While there is no statute with respect to annulment, the proceeding is recognized by the courts of this state and its status has been defined in People ex rel. Christiansen v. Connell, 2 Ill.2d 332, at pages 341–342, as follows:

"While in Illinois we have no act of the legislature expressly authorizing the courts to grant annulments and while the courts of equity of this state have gradually assumed jurisdiction to grant annulments in the absence of such a statute, the practice extending over a great number of years, we doubt not, in view of the considerations of public policy involved, that the legislature has a large measure of power which it may exercise in the regulation of such proceedings, and for the purpose of this decision it may be conceded without deciding that the origin of authority to annul is legislative in nature. Such a view accords with the history of the annulment action in England, and the existence of special statutes regulating annulment in many of the States."

A suit for annulment thus has a definite place in our judicial structure, a curious one to be sure, in that like the mule it is without pride of ancestry, but unlike that useful animal, progeny is plentiful. Does it not follow that having taken jurisdiction of an annulment proceeding, the court should have power to provide for the care of the children involved?

As early as Cowls v. Cowls, 3 Gilman 435 (1846) our courts have emphasized the importance of equity's role in providing for the care of children when marital ties are severed. In Thomas v. Thomas, supra, the case relied on by plaintiff, the court said the filing of the original bill for divorce brought the children within the jurisdiction of the court, that a cross bill was germane in seeking to have the care and custody of the children determined, even though the complaint did not so pray, and that at any time after the bill was filed questions relating thereto could have been brought before the court. While this had its basis in the statute relating to divorce, the opinion reveals the extent to which courts consider the care and custody of children an essential part of their function in a suit

502

that seeks to sever the marital relationship. To the same effect is Parker v. Parker, 335 Ill. App. 293, 301, wherein Mr. Justice Bristow speaking for the court said, p. 301:

". . . the cases are replete with declarations of the law that courts of equity have plenary jurisdiction over the persons and estates of infants, and that in cases where the rights of minors are concerned, they are the wards of the court, which will protect their interests. (Cowls v. Cowls, 3 Gilman, 435; Clarke v. Chicago Title & Trust Co., 393 Ill. 419; Swiney v. Womack, 343 Ill. 278, 287; Thomas v. Thomas, 250 Ill. 354). The petition herein presents the minor's right to support from her father, which right is independent of the obligations obtaining between her parents, and is, therefore, within the special province of the court of equity with its tradition of protecting the interests and estates of minors."

Such authority as there is in other states supports defendant's position that the court has jurisdiction in an annulment suit to provide for the care and custody of a child. Henderson v. Henderson, 187 Va. 121, 46 S.E.2d 10 (1948); Stone v. Stone, 193 Okla. 458, 145 P.2d 212 (1944); Bass v. Ervin, 177 Miss. 46, 170 So. 673 (1936); Barker v. Barker, 31 Wash.2d 506, 197 P.2d 439 (1948); Peterson v. Peterson, 164 Wash. 573, 3 P.2d 1007.

In Henderson v. Henderson, supra, the Supreme Court of Virginia held that the "right of a father to have his marriage annulled permits him to be relieved of his obligation as a husband, but does not permit him to rid himself of his obligations as a father." After holding that the child was legitimate under the provisions of the Virginia Code, the court held it was proper for a court upon annulling a marriage to make such further decree as it deemed expedient for the care, custody and maintenance of an infant child of

503

the parties. While this was supported by an interpretation of the statutes, it is apparent from a reading of the opinion that the court considered it to be an inherent part of its jurisdiction. In Stone v. Stone, supra, no statute covered the question, but the court said, p. 214:

"While we apparently have no statute on the subject we are of the opinion that the provision of 12 O. S. 1941, Sec. 1283, declaring that the children of the voidable marriage shall be legitimate, must be deemed to impliedly grant the power to provide for the future custody and support of such children when avoiding the marriage. The Supreme court of Arkansas has so construed a similar statute, saying that 'while the law permits him to be relieved of his obligations as a husband, it does not relieve him from those of a father.' Kibler v. Kibler, 180 Ark. 1152, 24 S.W.2d 867, 869."

In Bass v. Ervin, supra, the marriage was annulled on the ground of coercion. In the annulment suit the mother did not ask for support of the child but thereafter filed a bill of complaint for its support. The court held that a child born after the ceremonial marriage and before annulment was a legitimate child and that even though a decree made no provision therefor, it was still the duty of the father to support the child. In Barker v. Barker, supra, the marriage was annulled because of a prior existing marriage and the court made provision for the care and custody of the child of the parties. In Peterson v. Peterson, supra, a decree of annulment being entered the court provided for the care and custody of a child of the parties. It did so by applying to annulment cases the statutory provision relating to the care and custody of children in divorce cases and by holding that this was within the inherent jurisdiction of a court of equity.

It is our conclusion that while this is a matter of first impression in this state, public policy as laid

down by statute and judicial decision support defendant's position that a court of equity has jurisdiction to provide for the care and custody of children in annulment cases.

Plaintiff makes the further point that this was a void marriage, that the issue of a void marriage is illegitimate, and that the Legitimating Act of 1923 cannot be construed as conferring any rights or imposing any obligations on the father with respect to the child of such a marriage. In a consideration of this question we are confronted by a group of confusing statutes and a maze of legal principles and pronouncements of public policy. This is particularly true where the ground for annulment, as in the instant case, was a prior marriage which had not been dissolved. There is no question but that numerous decisions of our Supreme Court have declared bigamous marriages to be void ab initio. Cartwright v. McGown, 121 Ill. 388 (1887); Polokow Corp. v. Industrial Commission, 336 Ill. 395 (1929); Crysler v. Crysler, 330 Ill. 74 (1928); Crittenden v. Hindman, 271 Ill. 577 (1916); Cole v. Cole, 153 Ill. 585 (1894); Schmisseur v. Beatrie, 147 Ill. 210 (1893); Gordon v. Gordon, 141 Ill. 160. But these cases are by no means persuasive on the status of children of such marriages. For that we must examine the various statutes bearing on this question. They may be summarized as follows:

Ch. 33, Par. 1, Ill. Rev. Stat., 1844–1845, included bigamy among the grounds for divorce, but contained a further provision that "no such divorce shall, in any wise, affect the legitimacy of the children of such marriage, except in cases where the marriage shall be declared void on the grounds of a prior marriage." The 1869 statute contains the same language with respect to bigamy but provides that when a divorce is granted to a woman who in good faith had intermarried with a man having another wife, the court could

505

nevertheless allow the complainant alimony and maintenance as in other cases, but no such allowance was to be made as would be inconsistent with the rights of the other wife. An 1874 amendment incorporated the same language. These statutes are substantially the same today insofar as they relate to the question here under consideration. Since 1874 the first three sections of the Marriage Act have provided that blood relatives, persons mentally unsound, and males and females under certain proscribed ages shall not have the capacity to enter a marriage contract. Bigamists are not incapacitated by this section. In 1923 a provision was added to the Marriage Act (Ch. 89, Sec. 17a, Ill. Rev. Stat. 1955) which legitimated the children of a marriage in which a ceremony recognized by law had been performed.

In Harris v. Harris, 8 Ill. App. 57 (1880) the court held that in a suit for divorce on the ground of bigamy the prior spouse will be presumed dead, with the burden on the plaintiff to prove the contrary. Where there was no direct evidence that the first marriage was still in effect at the time the second was entered into, the validity of the second marriage has been upheld by presuming the death of the former spouse, as in Harris v. Harris, supra, or that the first marriage had been terminated by divorce. Johnson v. Johnson, 114 Ill. 611 (1887); Potter v. Clapp, 203 Ill. 592 (1903). The policy behind these presumptions is significant.

Thus it appears that while a bigamous marriage is said to be void ab initio, it is nevertheless a ground for divorce, which presupposes a valid marriage. It is also treated as valid insofar as alimony and maintenance for the wife are concerned when she was the guiltless party and entered into the marriage in good faith. It also appears from the foregoing that the Marriage Act, purporting to list those who have no

capacity to enter into a marriage contract, does not include bigamists. And finally, we have the Legitimating Act of 1923 which, without expressly repealing, nevertheless is in conflict with the other statutes cited. (Ch. 40, Sec. 4, Ill. Rev. Stat. 1955.) How are the antinomies in these laws to be resolved? Are children of such marriages to be treated differently from those of divorced parents?

██ There was, during the period in which these statutes were passed and these decisions rendered, a great change in the prevailing concepts and practices with respect to the marital relationship. Divorce increased at an astounding rate, from 82 out of 1000 marriages in 1900 to 252 out of 1000 in 1950. In 1946 the cost of aid to dependent children from broken homes in Illinois was $5,756,049. In 1951 the figure had increased to $13,912,000 (Chicago Bar Record, Vol. XXXIV, No. 6, March 1953). In 1950 the children of broken homes contributed 92% of the total registration in so-called "orphanages," that is, only 8% of those in orphanages were orphans in the ordinary sense. Thus the care of children from broken homes became a primary social problem. In an effort to stop the flood of broken family ties and revive the stability and dignity of marriage and the family, many laws were passed, including those prohibiting remarriage within a limited period after divorce and making such remarriages null and void. These laws were repealed after a period and new devices such as a sixty day "cooling off" period provided for. Coetaneously there came a great increase in the number of illegitimate children. Some were branded thus because of remarriages of parents within the prohibited period or of marriages duly celebrated and then annulled for other reasons. To mitigate their lot the Legitimating Act of 1923, to which we have before referred (Ch. 89, Sec. 17a, Ill. Rev. Stat. 1955) was passed. It is the over-

riding law on the question before this court. The statute reads as follows:

"Whenever persons attempt or have attempted to contract or be joined in marriage, and some form of marriage ceremony recognized by law has been performed in apparent compliance with the law in relation to marriage, and, pursuant to such attempt to contract and be joined in marriage, cohabit or have cohabited together as husband and wife, and there is issue born after the taking effect of this Act as a result of such cohabitation, such issue is hereby made legitimate and may take the name of the father, though such attempted marriage is declared void or might be declared void, for any reason."

This statute was not passed merely to give a child a name although it does include that specific provision. It was, as stated in the able and enlightened opinion with respect to a similar law, "founded in benevolence and charity" and its humanitarian principles require that it be liberally construed to effectuate its benign purpose. Henderson v. Henderson, supra. Such children not only have their father's name, they are entitled to look for and demand his care and protection. If we were to hold otherwise, we would have the anomaly of permitting, under circumstances such as exist here, a choice of remedy by divorce or annulment. If by divorce, then upon the granting of a decree the care and custody of a child could be provided for. If by annulment, the parent could escape such responsibility. It would be as if courts had granted one method of relief for parents callous and indifferent to the care and custody of their children and another for those who recognize their responsibility. There is no rational basis for such a distinction. Our conclusion is that defendant owed his child the duty of support and within the discretion of the court there was the correlative right of visitation.

508

■■ Certain other aspects of this case are unique. The mother scorns the proposal of the father to contribute to the child's support and to have the right of visitation. Whether this is based on her belief that the child could be better cared for without the father's interference or whether it is motivated by bitterness against him, we do not know. That is a matter for the consideration of the chancellor. It is not the parties whose desires or interest control the court in its determination of this matter. In Emrich v. McNeil, 126 F.2d 841 (1942) the court said, p. 844:

"But the important consideration which requires that the equity court—a court of competent jurisdiction—shall retain continuing and exclusive jurisdiction in the present case is one of public policy, i.e., the welfare of the minor child. Under such circumstances it is generally recognized that, independent of statute, a court of chancery has jurisdiction over the custody and maintenance of such a child. . . . It has power to change the custody of the child; to enforce the parental obligation to provide maintenance; and, if necessary, to remove the child from the custody of both parents."

It does not appear from the record in the instant case whether the court heard evidence which might have a bearing on the stability and tranquillity which are essential to the rearing of children. We assume the chancellor took that into consideration. However, the order in this case is not permanent. If the mother persists in her opinion that it is for the best interests of the child not to see his father, she can present her case on that point to the court after having tried the other course for a reasonable time.

■■ The order was not entered within thirty days after the entry of the decree. However, because of the state's interest, the care and custody of children of a severed marital relationship is always within the juris-

diction of the court which granted the divorce, and the court may entertain a petition with respect thereto at any time. Freestate v. Freestate, 244 Ill. App. 166 (1927), where an order was entered more than ten years after the divorce; Kelley v. Kelley, 317 Ill. 104 (1925); Parker v. Parker, 335 Ill. App. 293 (1948). The same rule should apply with respect to annulment. The order of the chancellor is affirmed.

Order affirmed.

ROBSON, P. J. and McCORMICK, J., concur.