MARY BELLUOMINI, Plaintiff-Counterdefendant-Appellee-Cross-Appellant, v. STEVEN R. BELLUOMINI, Defendant-Counterplaintiff-Appellant-Cross-Appellee.

First District (1st Division)   No. 78-96

Opinion filed July 2, 1979.—Supplemental opinion filed on denial of rehearing August 6, 1979.

Robert N. Caffarelli and Wayland B. Cedarquist, both of Boodell, Sears, Sugrue, Giambalvo & Crowley, of Chicago, for appellant.

Louis A. Rosenthal, of Chicago (Sidney Z. Karasik, of counsel), for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Mary Belluomini (plaintiff) filed a complaint for divorce, alimony and child support. Steven Belluomini (defendant) counterclaimed for an

annulment on the ground that he was a party to a prior undissolved marriage, as plaintiff then knew. On March 11, 1977, after trial, the trial court entered judgment which: (1) granted defendant an annulment; (2) found that plaintiff had failed to prove grounds for divorce; and (3) declared the child of the parties legitimate. On June 15, 1977, the trial court entered a supplement to the judgment. Defendant was required to pay child support in a specified amount.

Defendant appealed from certain portions of the judgment and the supplement thereto. Plaintiff filed a cross-appeal from denial of the divorce and alimony. In this court, counsel for defendant moved to withdraw as attorneys and to dismiss the appeal. Plaintiff objected to dismissal of the appeal. We allowed the withdrawal of counsel but denied the motion to dismiss. Subsequently, with leave of this court, counsel for defendant reinstated their appearance. Only the issues raised in the cross-appeal have been briefed for our consideration.

Plaintiff testified a friend introduced her to defendant in May of 1970. She was 27 years old. Defendant was 43. He told her he was from San Francisco, where he lived with his parents, he was single and had never been married. They began dating. One evening in January of 1971, defendant asked plaintiff to keep his wallet in her purse. Upon arriving home, plaintiff noticed that she still had his wallet. She examined it and discovered defendant was married and had three children. She called defendant and told him that she was going to mail the wallet back to him and she did not want to see him again. Defendant told plaintiff he had not seen his wife in 3 years and he was legally separated from her and in the process of getting a divorce. Plaintiff then agreed to and did continue to see him. At some time during this period they became closely intimate.

On March 3, 1973, defendant informed plaintiff that his divorce would be final in 6 or 7 months. He told her he loved her and asked her to marry him then. On September 23, 1973, defendant informed plaintiff that his divorce was final and they could be married. She accepted. Shortly thereafter she told defendant that she was pregnant. They were married on November 19, 1973. After the marriage ceremony, defendant asked plaintiff if she was sure she wanted the baby. Defendant told her that she could not have the baby. He told her he was not divorced, he had never been divorced and that she had to have an abortion. Plaintiff asked defendant why he had married her. He told her that he had not wanted to lose her and knew that they could not go on dating indefinitely.

The next time plaintiff saw defendant was on March 9, 1974. He came to her home where she was confined to her bed due to problems relating to her pregnancy. Defendant gave her $700 and stayed the night. She saw defendant again the next weekend. He stayed 2 nights on that occasion.

He telephoned her the following evening. Thereafter, plaintiff did not see or hear from defendant until June of 1974. On May 19, 1974, plaintiff gave birth to a baby boy.

In June of 1974 defendant came to plaintiff's home and gave her money for the doctor's bills. They later met on June 29 and 30 to discuss financial arrangements for the baby.

On cross-examination plaintiff testified that she asked defendant if she could see his divorce papers and defendant told her that he did not have them. Plaintiff and defendant stipulated that defendant had been at many of her family celebrations and social events from May of 1970 to November of 1973. As the trial court stated at one point, uncontradicted testimony of witnesses for plaintiff showed "a continuous course of association between the parties."

Defendant testified that he travelled constantly in his work. He met plaintiff in May 1970. At that time he was married to his present wife. They have three children. He denied any discussion with plaintiff concerning his marital status. They began dating. In January of 1971, plaintiff telephoned him to say she had discovered he was married. Defendant admitted the fact to her. Plaintiff was very upset but he never told her he was separated or in the process of getting a divorce and he never proposed marriage to her. Also, defendant testified that he and plaintiff never discussed marriage plans or an impending marriage. He never told her that his divorce was final so they could get married. The question of marriage never came up until after plaintiff learned she was pregnant.

In September of 1973 plaintiff informed defendant on long distance telephone that she had missed her period. That same month she told him she was pregnant. She asked him what they were going to do. Defendant replied that he was unable to do anything because he was already married. Plaintiff's mother suggested a sham marriage and an annulment. She told defendant that plaintiff would give him an annulment later if he paid the bills. Under the mother's threat that she would phone defendant's first wife about plaintiff's pregnancy, defendant agreed to this plan. They were married November 19, 1973. Defendant admitted returning to plaintiff's home in March of 1974. He did so because he was afraid that his first wife would be informed of plaintiff's pregnancy.

On rebuttal, plaintiff's mother denied making any threats to defendant or discussing the marriage until after it had taken place. She knew nothing about the marriage or pregnancy until plaintiff told her on November 22, 1973. She testified that she saw defendant at her home hundreds of times over a period of about 3½ years.

We note here that the Illinois Marriage and Dissolution of Marriage

Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*), became effective October 1, 1977. Notice of the cross-appeal herein was filed on September 30, 1977. Section 801(d) of this act provides:

"In any action or proceeding in which an appeal was pending * * * prior to the effective date of this Act, the law in effect at the time of the order sustaining the appeal * * * governs the appeal * * *."

Therefore, this appeal is governed by the prior divorce act (Ill. Rev. Stat. 1975, ch. 40, par. 1 *et seq.*).

One initial point requires clarification. There are actually two separate and distinct issues presented to us in this appeal. First, we are required to determine whether plaintiff was "the injured party" so that she could obtain a divorce. (See Ill. Rev. Stat. 1975, ch. 40, par. 1.) Assuming that plaintiff be found entitled to a divorce, the second issue concerns the propriety of an allowance of alimony. In this regard, we must decide if plaintiff married defendant "in good faith". (Ill. Rev. Stat. 1975, ch. 40, par. 20.) As required for clarity, we will discuss these issues separately.

## I.

The courts of Illinois recognize bigamy as a ground for annulment under the common law or for a divorce under section 1 of the Divorce Act (Ill. Rev. Stat. 1975, ch. 40, par. 1). (See *Cardenas v. Cardenas* (1956), 12 Ill. App. 2d 497, 506, 140 N.E.2d 377, *appeal denied* (1957), 11 Ill. 2d 629.) Section 1 of the Divorce Act provides:

"In every case in which a marriage has been or hereafter may be contracted and solemnized between any two persons, and it shall be adjudged * * * that either party * * * had a wife or husband living at the time of such marriage * * * it shall be lawful for the injured party to obtain a divorce and dissolution of such marriage contract."

■■ In the judgment entered March 11, 1977, the trial court annulled the marriage. This was based upon a finding that plaintiff was not entitled to a divorce because she did not marry defendant "in good faith by reason of the fact that she knew or should have known" that defendant had a prior undissolved marriage. In our view, "good faith" is not the correct test to apply to this phase of the case. Good faith is a factor only in the second phase of the case with reference to alimony. In addition the judgment of March 11, 1977, erroneously applied the standard that plaintiff "knew or should have known" that defendant was previously married. The proper and only test to be applied here is whether plaintiff was "the injured party." An "injured party" may be defined as one who did not

know that his or her intended spouse had a prior undissolved marriage. Consequently, the only factual issue pertinent here was whether plaintiff knew that defendant was not divorced at the time she married him.

After the trial on this first issue had been completed, on September 23, 1976, the parties and their counsel appeared in open court. The trial judge then stated some findings of fact. He found that plaintiff had a right to rely on defendant's statements that he was involved in a divorce case. Defendant told her this at the time she first found out that he was married and she then wanted to end their relationship. The trial court commented upon the close type of association between these parties and plaintiff's family. The court stated that when defendant told plaintiff he was going to be divorced within 6 months she had the right to believe this. When he obtained the necessary blood test and went through a marriage ceremony, plaintiff had a right to rely on this. The trial court expressly found that plaintiff "married him in the firm belief that he was telling her the truth and she relied on it, therefore she was without fault." The court added that plaintiff had the right to choose between annulment or divorce. Her counsel expressed preference for divorce. The trial court then stated, "She will have a divorce." In our opinion all of these findings by the trial court were supported by a strong preponderance of the evidence.

■■ No further testimony was heard after these findings were announced. However, in the judgment of March 11, 1977, the trial court found that plaintiff did not marry defendant "in good faith by reason of the fact that she knew or should have known" that he was married. It is remarkable that this judgment does not at any time make a finding of fact contrary to those previously announced by the trial court. However, as shown, the judgment order is legally erroneous because it granted defendant an annulment on the theory of good faith which had no bearing upon the rights of the parties in this phase of the case.

■■ It is manifest from the record and from the findings announced by the trial court that defendant could not have been the injured party. On the contrary, as the court expressly found, plaintiff was the injured party. In this type of situation there is a strong presumption in favor of the legality of the second marriage between these parties. (*Sparling v. Industrial Com.* (1971), 48 Ill. 2d 332, 336, 270 N.E.2d 411.) Plaintiff's situation is also buttressed by the legal presumption that a person would not willingly commit bigamy. (See *Baer v. De Berry* (1961), 31 Ill. App. 2d 86, 92, 175 N.E.2d 673.) Consequently, the judgment of March 11, 1977, is manifestly erroneous in that it denied a divorce to the innocent party and granted annulment to the guilty one. The choice of remedy should have been reserved for plaintiff as an innocent person.

## II.

■ The question of good faith arises after a divorce is granted and the spouse requests alimony or maintenance. Section 19 of the Divorce Act (Ill. Rev. Stat. 1975, ch. 40, par. 20) provides:

> "When a divorce is granted to a person who shall, in good faith, have intermarried with a person having at the time of such marriage another spouse or spouses living, the court may nevertheless, allow the plaintiff alimony and maintenance the same as in other cases of divorce * * *."

Black's Law Dictionary 822 (4th ed. 1951) defines good faith as:

> "Honesty of intention, and freedom from knowledge of circumstances which ought to put the holder on inquiry."

Webster's Third New International Dictionary 978 (1971) defines good faith as:

> "a state of mind indicating honesty and lawfulness of purpose; belief in one's legal title or right; belief that one's conduct is not unconscionable or that known circumstances do not require further investigation; absence of fraud, deceit, collusion or gross negligence * * *."

In *Crouch v. First National Bank* (1895), 156 Ill. 342, 357, 40 N.E. 974, the supreme court defined good faith as an " 'honest, lawful intent; the condition of acting without knowledge of fraud, and without intent to assist in a fraudulent or otherwise unlawful scheme.' (Anderson's Dictionary of Law.)" These definitions must be read within the context of the confidential relationship brought about by parties contemplating marriage. As we stated in *Arndt v. Arndt* (1948), 336 Ill. App. 65, 76, 82 N.E.2d 908:

> "The general rule is that '* * * one who has intentionally deceived the other to his prejudice is not to be heard to say, in defense of the charge of fraud, that the innocent party ought not to have trusted him or was guilty of negligence in so doing.' [Citations.] * * * This is especially true where there is a relation of trust and confidence as between parties contemplating marriage [citation], and where knowledge as to the truth or falsity of the alleged misrepresentation is peculiarly within the possession of the defrauding party."

In the instant case, plaintiff relied implicitly and innocently upon the representation made by defendant to her and upon the performance of the marriage ceremony. She had a right to rely on these representations and was under no duty to investigate further. The factual basis for these statements appears strongly from the findings announced by the trial court on September 23, 1976, as above set out. The legal presumption against bigamy above noted assists plaintiff in this regard.

The parties were not discussing a business transaction, but a marriage, the very cornerstones of which are mutual trust and confidence. This court will not require parties who are contemplating marriage to act with the same caution, doubt and adverse investigation they would be expected to employ in business matters.

■■ Consequently, we find that the trial court erred in the judgment of March 11, 1977, in finding that plaintiff was not "in good faith by reason of the fact that she knew or should have known that defendant was married." In our opinion, the evidence strongly supports the fact that plaintiff married defendant in good faith with the honest belief that there was no impediment to their marriage. Insofar as the trial court granted defendant an annulment, the judgment of March 11, 1977, is reversed and the cause remanded with directions for entry of a proper judgment for divorce in favor of plaintiff. The trial court is further directed to consider allowance of alimony to plaintiff and to determine the nature, amount and duration of such allowance. In all other respects, the judgment of March 11, 1977, and the supplemental judgment of June 15, 1977, are affirmed.

Affirmed in part, reversed in part and remanded with directions.

O'CONNOR and CAMPBELL, JJ., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

The petition for rehearing filed by defendant criticizes our opinion for not stating the testimony of Doctor Wilkey and Doctor Daro. The petition states that this testimony "bears directly on the issue whether Mary Daley and her Mother are to be believed." This language requires an additional statement on our part. Of course we were and are familiar with the testimony of these two doctors. However, our opinion did not purport to state or summarize every minute portion of the testimony. We feel that we are limited by considerations of time and space to a statement of the material matters. As shown in our opinion, the issue here was not whether plaintiff was actually pregnant at the time of the marriage. The date of ascertainment of pregnancy is not, in our view, material. The important factor, as stated by the trial court, is the belief of plaintiff as to the marital status of defendant at the time their marriage was solemnized.

As our opinion shows, the trial court expressly found that plaintiff was without fault and later changed this proper result without hearing

additional evidence. Thus, we considered the testimony of these two doctors not directly material. Their testimony did not, in our estimation, impeach either plaintiff or her mother. The issue of the exact time of commencement of pregnancy or the exact date of its disclosure was collateral and did not bear upon plaintiff's knowledge of defendant's marital status.

The petition for rehearing is accordingly denied.

O'CONNOR and CAMPBELL, JJ., concur.