Mozell GREY, Plaintiff-Appellant,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Defendant-Appellee.

No. 709, Docket 82–6249.

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1983.

Decided Oct. 24, 1983.

Florence Roberts, Brooklyn, N.Y. (Brooklyn Legal Services Corp. A, and Arnold Rothbaum, Brooklyn, N.Y., of counsel), for plaintiff-appellant.

Beryl Jones, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D. N.Y., Miles M. Tepper and Ben Wiles, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for defendant-appellee.

Before LUMBARD, VAN GRAAFEILAND and PIERCE, Circuit Judges.

LUMBARD, Circuit Judge:

Following the death of Arthur Grey, Mozell Grey applied for widow's insurance benefits, pursuant to section 202(e) of the Social Security Act, 42 U.S.C. § 402(e). The Secretary of Health and Human Services denied her application, finding that Arthur had divorced her some time between 1931 and 1961 and that Margaret Grey, who married Arthur in 1961, was his surviving wife. The district court affirmed the Secretary's determination, finding it to be supported by substantial evidence. We reverse.

Under the statute, Mozell is entitled to widow's benefits if the courts of Illinois, Arthur's domicile at the time of his death in 1977, "would find that [the] applicant and [the] insured individual were validly married at the time [of his death]." 42 U.S.C. § 416(h)(1)(A) (1976).

The weight of the evidence in this case clearly overwhelms any presumption that Illinois may indulge in favor of the validity of Arthur Grey's marriage to Margaret and hence against the continuation of his 1921 marriage to Mozell Grey.[1] Mozell has established, by all the means available to her and to the Social Security Administration (SSA), that Arthur never divorced her. Under Illinois precedents it is abundantly clear that the Illinois courts would so hold. There is no substantial evidence to support the contrary determination of the Secretary or the manifestly reluctant affirmance of that determination by the district court.

We therefore conclude that petitioner is entitled to receive benefits under the SSA.

THE FACTS

Arthur Grey married Mozell, née Darsey, in Opelika, Alabama, on July 23, 1921. Mozell bore him a daughter, Ann Elizabeth, in 1922, and the couple continued to reside in Opelika for about seven years from the time of their marriage, although Arthur's job as an itinerant mason took him, with his father, to various cities in the South. Mozell and Ann Elizabeth have both testified that around 1928, while on a job in Atlanta, Arthur committed a crime (apparently aggravated assault) and that he was more or less on the run from the police thereafter, but returned periodically to visit his family. The Administrative Law Judge (ALJ) found that he finally deserted Mozell and passed beyond her ken "about 1931," and we see no reason to disturb that finding.

Arthur then apparently fled to the Great Lakes area. His movements from 1931 to 1936 are somewhat obscure. The SSA, however, learned from Margaret, whom Arthur married in 1961, that he told her that he had lived in Milwaukee, Cleveland, and Detroit before moving to Chicago.

From 1936 until his retirement in 1966, Arthur was continuously employed by the Midland Ross Division of National Casting in Cicero, Illinois, which is a suburb of Chicago and lies in Cook County. In a statement annexed to his claim for retirement benefits in 1966, he stated that he had married a Mary Holt in Chicago in 1942. (No record of this marriage could be found, and Ms. Holt has not appeared.) Arthur returned once to Alabama during this period, apparently in 1947, to attend his father's funeral. He saw both Mozell and Ann Elizabeth at the funeral and did not mention a divorce, either completed or contemplated, to either of them.

---

1. In the caption of this case, the appellant spells her last name "Grey." The forms "Gray" and "Grey" are used inconsistently for both Arthur and Mozell throughout the administrative record. Arthur himself appears always to have used the form "Gray," and it so appears on the certificate of his marriage to Mozell. Mozell has explained that the Social Security Administration at some point "insisted that GRAY wasn't a real name and that I must use GREY." There is no dispute, however, that Arthur and Mozell were married to each other in 1921.

In 1954, Arthur met Margaret Rushing and in 1961 went through a ceremonial marriage with her in Chicago, which was evidenced by a certificate but not recorded with the county. At some undisclosed point in their acquaintance, according to Margaret's evidence, Arthur "told her he divorced somebody in Detroit M[ichigan]." On retirement in 1966, Arthur listed Margaret as his wife on his application for social security benefits, leaving blank several lines that requested information about any previous marriages. In 1974, Arthur and Margaret moved to Rockford, Illinois, where they lived until Arthur's death in 1977.

Mozell, meanwhile, lived with her daughter in Opelika, in continuous contact with Arthur's brother and eldest sister. In 1955, Ann Elizabeth moved to Brooklyn, New York, where Mozell followed her two years later. Mozell and Ann Elizabeth have lived in Brooklyn, with the knowledge of Arthur's relatives, ever since. (When Arthur wanted to get in touch with Ann Elizabeth in 1975, he was able to obtain her address at once from Julia Jones, his sister in Milwaukee, who had in turn gotten it from one "Kathyrin"—presumably the sister still in Alabama.) Mozell has repeatedly stated, without contradiction and with the support of Ann Elizabeth, that she was never apprised of any divorce proceedings against her, that she never divorced Arthur, and that she never remarried.

In the summer of 1976, slightly over a year before his death, Arthur visited his sister, Julia Jones. Julia described this visit in a contemporaneous letter to Mozell:

> Brother call 2 Sundes ago wont to know what your name was before you all got married wont to know did you ever married again he said he hafter get a dovice [?] from you. [Spelling and punctuation reproduced from original.]

Julia repeated this account in substance in answer to interrogatories in 1980, and added her "belief" that Arthur had never divorced Mozell. She maintained this opinion despite the fact that "Arthur had mentioned [to Julia] that he had divorced Mozell, but he never went into specifics." In August of 1976, Margaret wrote to Ann Elizabeth. She did not mention the subject of divorce in that letter, but did remark that Arthur had asked Julia for Mozell's maiden name.

Arthur died in Rockford, Illinois, on October 28, 1977. On November 3, 1977, Margaret applied for and began receiving widow's insurance benefits. Thereafter, on November 13, 1978, Mozell applied for widow's insurance benefits. After Mozell had filed her claim for widow's benefits, the SSA, acting on its information from Margaret, searched or caused to be searched the divorce records for the counties containing Opelika, Milwaukee, Cleveland, Detroit, Chicago and Cicero, and the two towns in which Arthur lived after his retirement. In addition, the SSA commissioned a search of the records of Lake County, Indiana, which is just across the state line from Chicago. None of these searches located any record of a divorce between Arthur and Mozell.

Mozell's application was denied on September 24, 1979, on the ground that the presumption indulged by Illinois law in favor of the validity of Arthur's marriage to Margaret had not been rebutted. On November 16, 1979, Mozell requested reconsideration of her application, contending that she had never been divorced from Arthur. Upon reconsideration, the denial of benefits was affirmed on the grounds that Mozell had failed to account for Arthur's whereabouts after he left her, and he was therefore presumed to have divorced her before he married Margaret.

Mozell thereafter sought and secured a hearing before an Administrative Law Judge. Testimony was introduced at the hearing that Mozell had neither instituted divorce proceedings against Arthur nor heard of any such proceedings having been instituted by him. Evidence also was introduced showing negative results of searches through divorce records in those places where Arthur was known or believed to have resided. The Administrative Law Judge upheld the denial of Mozell's application on the ground that Mozell's "proof and the evidence in the record [did] not reason-

ably rebut the presumption that there existed no legal impediament [sic] at the time of [Arthur's] marriage to Margaret Grey," and that Arthur "obtained a divorce in the marriage between himself and Mozell Grey sometime between 1931 and August 11, 1961."[2] On July 12, 1981, the ALJ's decision became final when it was approved by the Appeals Council.

Mozell then sought review in the Eastern District of New York pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g). On July 23, 1982, Judge Bramwell granted the Secretary's motion for judgment on the pleadings, and this appeal followed.

The Secretary's ruling in favor of Margaret may not be overturned unless it is based on legal error or is not supported by substantial evidence. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). We conclude that the administrative decision was defective in both respects.

■ Under § 216(h)(1)(A) of the Social Security Act, 42 U.S.C. § 416(h)(1)(A), appellant's status as Arthur's widow must be determined by the law of Illinois, the State in which Arthur was domiciled at the time of his death. *Steele v. Richardson,* 472 F.2d 49, 51 (2d Cir.1972). Under Illinois law, where there are conflicting marriages, the second marriage is to be presumed valid on the theory that the twice-married spouse is entitled to a presumption of innocence of the crime of bigamy. *Belluomini v. Belluomini,* 73 Ill.App.3d 836, 841, 30 Ill.Dec. 14, 18, 392 N.E.2d 669, 673 (1979).[3] To support that master presumption, Illinois law provides that "[w]here the celebration of a marriage is shown and also a prior marriage, the death or divorce of the former spouse will be presumed, and the burden of proof is on the party asserting the

invalidity of the last marriage." *Baer v. DeBerry,* 31 Ill.App.2d 86, 89, 175 N.E.2d 673, 674–75 (1961); *Winter v. Dibble,* 251 Ill. 200, 206, 95 N.E. 1093, 1095 (1911).

■ In ruling against Mozell, the ALJ, whose determination became the final decision of the Secretary upon approval by the SSA Appeals Council, implicitly exaggerated the rigor of the Illinois rule that a divorce will be presumed in order to sustain the validity of the second marriage. An administrative determination by the SSA cannot be upheld when based on an erroneous view of the law that improperly disregards highly probative evidence. *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). The ALJ, sitting in Brooklyn, cited no precedents to support his construction and application of Illinois law. His surprising failure even to mention in his decision the extensive checks of divorce records suggests, to the extent that the administrative analysis is penetrable at all, that the ALJ simply followed the interpretation of Illinois law adopted by the SSA Reconsideration Reviewer on the case: that the presumption in favor of a legally obtained divorce could be rebutted only by an exhaustive record search of *all* jurisdictions in which an absconding spouse might conceivably have obtained such a divorce. The district court's discussion of *Patton v. Railroad Retirement Board,* 313 F.2d 434 (5th Cir. 1963) (applying Illinois law), and *Davis v. Califano,* 603 F.2d 618 (7th Cir.1979) (same), clearly indicates that it adopted the same extreme view of Illinois law as placing a virtually insurmountable burden of negative proof on the party alleging nondivorce.

Were the Illinois rule in fact as unyielding in its defense of the presumption of divorce as the ALJ and district court appear

---

**2.** The Administrative Law Judge in this case made no findings of credibility, except for the single observation that Mozell's "assertions of never having been served in a divorce proceedings [sic] may be accurate." The district court also simply recited the evidence without making findings of credibility, and indeed without suggesting that any of it was conflicting. On this appeal, therefore, we must simply take all

the evidence in the administrative record for what it is worth.

**3.** The presumption of validity of a second marriage is a creation of Illinois courts elaborating the common law of the state. *See, e.g., Sparling v. Industrial Commission,* 48 Ill.2d 332, 336, 270 N.E.2d 411, 413 (1971) (citing judicial precedents).

to believe, it would be difficult to justify on grounds of common sense and fairness. Maintaining such a presumption even when a thorough search has uncovered no record of divorce in any jurisdiction in which the absconding spouse would have been likely to file requires one to believe that men who abandon their wives and flee to unknown places will then undertake the trouble and expense of bringing secret divorce proceedings, the decrees from which would be of highly doubtful validity.[4] It also requires one to overlook the inequities such a virtually irrebuttable presumption would work. The Illinois Supreme Court itself long ago painted as striking a picture of those equities as one could hope to find:

> She, it may be said, remains true to her marriage vows. He deserts her, without cause, goes to a foreign country, and contracts a second, void marriage. She may be, and generally is, in such a case, powerless to prove that he had not, at some time, in some jurisdiction, obtained a divorce. Shall she, upon a mere presumption of his innocence, be deprived of all her rights as a wife or widow because she cannot produce such negative proof? We do not think a fair construction of our decisions could logically lead to such a result. . . .
>
> Suppose, as in this case she did, the wife proves her marriage; that she in no way violated her marriage obligations; that her husband, without cause, deserted her; that she had no knowledge of his second marriage until after his death; that she had no personal knowledge of his having obtained a divorce, and her marriage was never dissolved in the jurisdiction where she lived when he deserted her, and where she continued to live to the time of his death. Would not these

facts, in the absence of all counter testimony, afford reasonable ground for presuming that no divorce was obtained? *Cole v. Cole,* 153 Ill. 585, 587–88, 38 N.E. 703, 704 (1894).

But Illinois courts have in fact used a considerably more flexible and fact-specific standard of proof in cases involving the presumption of divorce.[5] The Supreme Court of Illinois has long recognized that:

> [a]lthough the responsibility [is] upon [parties challenging marriages] of proving the negative contention that a divorce ha[s] not been obtained . . . yet it is well settled that a party is not required to make plenary proof of a negative averment. It is enough that he introduces such evidence as, in the absence of all counter testimony, will afford reasonable ground for presuming that the allegation is true, and, when this is done, the onus probandi will be thrown on his adversary.

*Schmisseur v. Beatrie,* 147 Ill. 210, 217, 35 N.E. 525, 527 (1893), quoted in *Cole v. Cole,* 153 Ill. 585, 587, 38 N.E. 703, 704 (1894), and in *In re Estate of Dedmore,* 257 Ill.App. 519, 522–23 (1930); *accord Sparling v. Industrial Commission,* 48 Ill.2d 332, 336, 270 N.E.2d 411, 413 (1971) ("[T]he presumption may be rebutted by evidence which, standing alone, affords reasonable grounds for concluding that no divorce has been secured."); *In re Estate of Panico,* 268 Ill. App. 585, 591 (1932) ("[E]vidence which renders the existence of the negative probable is sufficient, in the absence of proof to the contrary."). The ALJ, in failing even to advert to the heroic searches that the SSA made in the divorce records of seven states, which evidence would be probative of, if not compel, a finding of rebuttal under a proper reading of Illinois law,[6] implicitly rejected

4. *See* footnote 12, *infra.*

5. The basic surveys of state law take the same view. In one, Illinois is listed as one of the states that "appear to accept a minimum amount of evidence controverting the presumption." 52 Am.Jur.2d, *Marriage* § 144, at 992 (1970) (footnote omitted). The other regards the Illinois standard for rebuttal as undemanding in comparison with those prevailing in certain other states. *See* 55 C.J.S., *Marriage* § 45(d), at 917 & nn. 4–5 (1948).

6. Two of the four Illinois cases in which record searches were undertaken held that the presumption had been rebutted. *Compare Schmisseur v. Beatrie,* 147 Ill. 210, 35 N.E. 525 (1893) (holding presumption rebutted), and *In re Estate of Dedmore,* 257 Ill.App. 519, 35 N.E. 525 (1930) (same) (lack of divorce "may be shown and generally should be shown," by

that proper reading in favor of the erroneous interpretation given by the SSA reviewer. This failure was an error of law that alone would mandate reversal and remand for a redetermination in light of proper legal standards.

■ No such remand is needed in this case, however, for a recital of the undisputed evidence shows that the Secretary's factual conclusion is not supported by substantial evidence. The statutory formula that we must affirm the Secretary's findings of facts if they are supported by substantial evidence, 42 U.S.C. § 405(g) (Supp. V 1981), requires nevertheless that there be " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). It is well established, moreover, that a reviewing court must consider the record as a whole, not seize upon "a specific quantum" of evidence that, taken in isolation, might sustain the administrative decision. *Day v. Weinberger,* 522 F.2d 1154, 1156 (9th Cir.1975) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951)); *accord Flores v. Department of Health, Education and Welfare,* 465 F.Supp. 317, 320 (S.D.N.Y.1978). Our responsibility is always to ensure that a claim has been fairly evaluated, *e.g., Proctor v. Schweiker,* 526 F.Supp. 70, 73–74 (D.Md.1981), and "has warrant in the record, viewing that record as a whole," *Boyd v. Folsom,* 257 F.2d 778, 781 (3d Cir.1958) (citing *Universal Camera, supra* ).

Exercising that responsibility in this case, we conclude that the Secretary, in light of

available evidence, could not reasonably have determined that Mozell failed to sustain her burden of proof under Illinois law. The district court, while affirming the administrative decision, acknowledged that the "evidence tends to show that Arthur never divorced Mozell." That understates the case. In the face of the evidence adduced, it is not merely probable that Arthur never obtained a divorce—a conclusion that would itself be sufficient to rebut the contrary presumption under Illinois law; it is established to a virtual certainty, on at least three separate grounds.

First, record searches of every jurisdiction in which Arthur would have been likely to seek a divorce have turned up no evidence whatsoever of such a divorce.[7] Arthur's whereabouts from 1936 to the time of his death are established by his unbroken employment at a single firm in Cook County for thirty years, followed by his successive moves with Margaret after retirement. All of the relevant counties—plus the county in Indiana nearest to Chicago—have been searched for records of any divorce involving Arthur, with uniformly negative results. For the years 1931 to 1936, Arthur told Margaret he had lived in three cities in the Great Lakes region; there is no evidence in the record to suggest that he lived anywhere else before settling down in Chicago. Margaret reported that information to the SSA, and these localities too have been searched for divorce proceedings.[8] In addition, a record search was done in the Alabama county containing Opelika, the town in which Mozell resided for most of the period from Arthur's departure until his marriage to Margaret.

The Illinois courts direct, sensibly enough, that a search for a divorce decree should be focused "where such decree should be found, if it existed at all," and accept nega-

---

record searches), with *Baer v. DeBerry,* 311 Ill.App.2d 86, 175 N.E.2d 673 (1961) (holding presumption not rebutted), and *Young v. Young,* 213 Ill.App. 402 (1918) (alternate holding) (same). The court in a fifth case hinted strongly that record searches would have overcome the presumption had they been undertaken. *See In re Estate of Panico,* 268 Ill.App. 585, 591 (1932).

7. Record searches were conducted for both "Grey" and "Gray," the variant spellings of Arthur's name. *See* n. 1 *supra.*

8. Margaret had every incentive to relate all she knew of Arthur's history to the SSA, because an SSA representative had told her that she had to put the agency on the track of positive proof of divorce on pain of losing her benefits.

tive results as sufficient rebuttal of the presumption. *Panico, supra,* 268 Ill.App. at 591; *accord Dedmore, supra,* 257 Ill.App. at 524 (varying the quotation slightly). The Illinois Supreme Court, in a seminal case involving a couple who had lived continuously in one county, held a search of that county's records to be sufficient to rebut the presumption of divorce, describing that jurisdiction as the one in which "divorce proceedings, if there had been any, would be *most naturally* looked for." *Schmisseur v. Beatrie, supra,* 147 Ill. at 218, 35 N.E. at 527 (emphasis added). That requirement seems amply met by the scope of the searches undertaken in this case.[9] Every reasonable effort has been made to track Arthur, and his movements have been followed to the fullest extent possible. In the absence of some affirmative reason to believe in the existence of a divorce, no sensible law should require more, and the law of Illinois does not.[10]

Against this uniform silence in the records, there is only one piece of evidence

pointing to a place in which Arthur might have dissolved his marriage to Mozell: Margaret's report that Arthur told her that he had divorced "somebody" in Detroit. Because this assertion runs up against the fact that no record of divorce was found in Detroit, however, it may actually tell in Mozell's favor. The Seventh Circuit, applying Illinois law, took the view that the probative value of negative searches was "bolstered" by testimony from a second wife that her husband was divorced from his first wife in a jurisdiction whose records were fruitlessly searched. *Davis v. Califano,* 603 F.2d 618, 625 (7th Cir.1979). In view of all the facts, the only reasonable inference to be drawn is that no divorce record was found because there was none to be found.[11]

The second reason for thinking Arthur never divorced Mozell lies in the evidence given by Julia Jones, Arthur's sister. On some unspecified date, he told her that he had been divorced, but "did not go into

---

**9.** The leading federal decision applying Illinois law also refused to require unlikely jurisdictions to be searched on the basis of pure conjecture. In that case, the second wife attempted to ward off rebuttal of the presumption of a valid divorce by pointing out that her husband had been a long-haul truckdriver for four years and thus could have obtained a divorce almost anywhere in the United States. In addition to fairly persuasive evidence that the husband had never resided anywhere but in Tennessee and Illinois, the Seventh Circuit relied upon negative searches of divorce records in appropriate counties in those states to hold that the first wife successfully rebutted the presumption of validity of the second marriage. *Davis v. Califano,* 603 F.2d 618 (7th Cir.1979).

**10.** Of the one federal and two state court decisions holding that the Illinois presumption of divorce had not been rebutted by particular record searches, none is to the contrary.

The courts in *Patton v. Railroad Retirement Board,* 313 F.2d 434, 437 (5th Cir.1963), and *Young v. Young,* 213 Ill.App. 402 (1918), while indicating that a set of negative searches "did not compel" a finding that the presumption was rebutted, *Patton,* 313 F.2d at 437, were swayed more by the existence of substantial doubt, on the facts before them, whether the putative first wife had ever been married to her alleged husband.

*Baer v. DeBerry,* 31 Ill.App.2d 86, 175 N.E.2d 673 (1961), is more troublesome. The court held that negative divorce searches of counties in four states in which the husband had been known to live did not suffice to overcome the presumption, given that the husband had been itinerant and had engaged in various types of work. *Id.* 31 Ill.App.2d at 92, 175 N.E.2d at 676. There was testimony, however, from an independent witness that the husband said he had been divorced "through the newspapers," and the court discredited the interested testimony of the claimant, the husband's son by his first wife, that the husband had told him that there had been no divorce. *Id.,* 175 N.E.2d at 676. In the present case, the only dubious evidence is Arthur's statement that he had divorced "somebody" in Detroit, which is contradicted by the Detroit divorce rolls, and his statement to Julia that he had been divorced, which he later contradicted himself and which Julia disbelieved.

**11.** Although "the drawing of permissive inferences is a matter within the prime responsibility of the Secretary," *Mendoza v. Secretary of Health and Human Services,* 655 F.2d 10, 14 (1st Cir.1981), this power is always subject to a duty to consider "the consistency and inherent probability of the testimony." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951), and to articulate standards for assessing evidence, *see Mendoza, supra,* 665 F.2d at 14.

specifics." In 1976, only a year before his death, Arthur said to her that he still needed to get a divorce from Mozell. The ALJ, presumably seizing upon the phrase in Julia's answers to interrogatories in which she avowed that she had only a "belief" that Arthur had never divorced Mozell, treated her entire testimony as a mere statement of belief. Yet the ALJ himself noted that her 1976 letter, about which she was questioned, "suggests that the claimant may not have been divorced." Thus, we have an uncontradicted report of an unequivocal statement by Arthur that, moreover, constituted an admission against interest by him. The natural inclination to credit that statement is further supported by Margaret's letter to Ann Elizabeth inquiring about Mozell's maiden name. The ALJ found that Margaret's letter established only a "familial interest," but it is hard to see what could have prompted this inquiry out of the blue except the reason given by Arthur when he solicited the same information from Julia: that he needed it in order to obtain a divorce. Finally, it is not inconsequential that Julia herself resolved the conflicting statements she had received from her brother in favor of a belief that there had been no divorce.

■ Third, Mozell resided in only two places during the fifty-six years in which she held to her marital pledge, both of which addresses were known to Arthur's family, and in all likelihood to Arthur himself. Mozell's testimony that she was never served with divorce papers, even though at every point in time Arthur either knew or could have readily ascertained her address through his family network, stands uncontradicted and was apparently accepted as fact by the ALJ. *See supra* note 2. The

latest pronouncement of the Illinois Supreme Court on the presumption of divorce approved a finding of nondivorce on the ground, among others, that when a wife whose address is known to the husband receives no summons for a divorce action, a court can infer that no divorce was obtained. *Sparling v. Industrial Commission, supra,* 48 Ill.2d at 337, 370 N.E.2d at 414 (1971); *see also Cole v. Cole, supra,* 153 Ill. at 588, 38 N.E. at 704. It should be noted that under these circumstances, any divorce that Arthur obtained would have been void as a violation of the requirements of due process.[12] But here we do not need to reach a question of constitutional due process dimensions. By the standards of Illinois common law, common sense, and common justice alike, the presumption that Arthur sought and obtained a divorce must be held to be amply rebutted by substantial proof that Arthur was never divorced—validly or invalidly—from Mozell.

■ Under Illinois law, a presumption, once rebutted, vanishes entirely from a case. *Diederich v. Walters,* 65 Ill.2d 95, 100–02, 2 Ill.Dec. 685, 688–89, 357 N.E.2d 1128, 1131–32 (1976) (citing extensive Illinois precedent). This rule has been held applicable to the presumption of divorce, *Dedmore, supra,* 257 Ill.App. at 523, and the SSA and the federal courts are required under 42 U.S.C. § 416(h) to give the same effect to state-created presumptions that a state court would. *Spradlin v. United States,* 262 F.Supp. 502, 504 n. 4 (D.Mont. 1967). Once the presumption is rebutted, no evidence of any weight remains on the record to show that Mozell was not Arthur's wife until the day he died. Accordingly, we hold the Secretary erred as a matter of law in holding against Mozell.

12. In this case, for example, it is uncontested that Mozell could have been located at any moment in Arthur's life for the price of one, or at most two, stamps. Due process requires that a good-faith effort be made to notify the spouse of pending divorce proceedings by means reasonably calculated to be effective. Mozell's address being readily ascertainable by Arthur, service by publication would unquestionably have been constitutionally inadequate. *See, e.g., Schroeder v. City of New York,* 371 U.S. 208, 211–14, 83 S.Ct. 279, 281–83, 9 L.Ed.2d 255 (1962); *Mullane v. Central Hano-*

*ver Bank & Trust Co.,* 339 U.S. 306, 314–20, 70 S.Ct. 652, 657–60, 94 L.Ed. 865 (1950); *Baggett v. Baggett,* 541 S.W.2d 407, 410–11 (Tenn.1976) (applying *Schroeder* and *Mullane* standard to divorce case). If a divorce decree is rendered in violation of due process, it is of course void in the rendering state and hence not entitled to full faith and credit. *See, e.g., Williams v. North Carolina,* 317 U.S. 287, 306, 63 S.Ct. 207, 216–17, 87 L.Ed. 279 (1942) (Frankfurter, *J.,* concurring); *Atherton v. Atherton,* 181 U.S. 155, 172–73, 21 S.Ct. 544, 550–51, 45 L.Ed. 794 (1901).

We reverse the judgment of the district court and direct entry of judgment pursuant to 42 U.S.C. § 405(g) (Supp. V 1981), awarding widow's benefits to Mozell Grey.

VAN GRAAFEILAND, Circuit Judge, dissenting:

In 1931, Herbert Hoover was President of the United States, and Adolph Hitler was a struggling German politician. Pearl Harbor was a decade away, as was also the advent of commercial television and jet-propelled aircraft. Four years were to elapse before the enactment of the Social Security Act, 49 Stat. 620, and nine years would elapse before the benefits of the Act were made available to survivors, 53 Stat. 1362.

It was in 1931 that Arthur Grey and his first wife, Mozell, separated.[1] During the forty-six years between the separation and Arthur's death, he saw Mozell once, and that was at his father's funeral in 1947.

On August 11, 1962, Arthur and Margaret Rushing were married by Bishop Luther B. Hylton in Chicago. At the time this occurred, the temporal laws of Illinois made bigamy a felony punishable by imprisonment for up to five years, 38 Smith-Hurd Ill.Ann.Stat. § 11–12, and adultery a Class A misdemeanor punishable by imprisonment for up to one year, id. § 11–7. Of greater significance to those who believe, was the spiritual law of Bishop Hylton's church, which admonished in the words of the Commandment written with the finger of Divinity, "Thou shalt not commit adultery."

Today, as a result of my colleagues' decision, Arthur, deceased and unable to speak in his own defense, is branded as a criminal, and his bereaved helpmate, Margaret, who cared for him while he was alive and buried him when he died, is stigmatized as an adulteress. Henceforth, she will be denied the Social Security benefits for which she and Arthur alone made the necessary sacrifices, and she even may be forced to repay the benefits she has already received, 42 U.S.C. § 404(a). Moreover, as an adjudicated adulteress, she may have to account for any other property she might have received as Arthur's widow, see Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). I don't believe that either the Social Security Act or the law of Illinois requires me to concur in this result.

From the early days of English common law, judicial decisions have reflected a societal preference for order over chaos, morality over immorality, and innocence over guilt. See Hynes v. McDermott, 91 N.Y. 451, 458–62 (1883); Yarbrough v. United States, 341 F.2d 621, 625 (Ct.Cl.1965); McCormick, Handbook of the Law of Evidence § 312 at 653 (1954); 9 Wigmore on Evidence § 2506 (1981). Finders of fact are permitted to make logical inferences of innocent behavior, because "[c]onformity to recognized standards of conduct is the usual and customary action of every member of the community." Matter of Callahan, 142 Misc. 28, 34, 254 N.Y.S. 46 (1931), aff'd, 236 A.D. 814, 259 N.Y.S. 987 (1932), aff'd, 262 N.Y. 524, 188 N.E. 48 (1933).

In some instances, the likelihood of conformity is so strong as to warrant a presumption of morality and innocence. In Illinois, as in most other states, this presumption applies where the validity of a second marriage is challenged. Patton v. Railroad Retirement Bd., 313 F.2d 434, 437 (5th Cir.1963); Sparling v. Industrial Comm'n, 48 Ill.2d 332, 336, 270 N.E.2d 411 (1971); Belluomini v. Belluomini, 73 Ill. App.3d 836, 841, 30 Ill.Dec. 14, 392 N.E.2d 669 (1979). This presumption is rebuttable, however, and my reading of the record satisfies me that the Secretary clearly understood this to be the law.

However, a presumption is not the same thing as an inference. An inference is a reasonable deduction from proven facts; a presumption is a deduction mandated by proven facts. Sewell v. United States, 406 F.2d 1289, 1294 (8th Cir.1969); see 1 Devitt & Blackmar, Federal Jury Practice and In-

---

1. The ALJ did not find that Arthur deserted Mozell. Echoing Mozell's own words, the ALJ found that Arthur and Mozell "separated" about 1931, and that they never lived together thereafter. Indeed, based on the statement of Arthur's sister, Julia, the ALJ could have found that the separation actually took place in 1923.

50

*structions* § 15.03 (1977). The mandate of a presumption may be removed from a case by rebuttal evidence. The Secretary, as the trier of the facts, always may, and should, make such inferences from the evidence as are dictated by reason and common sense. Moreover, the finality which 42 U.S.C. § 405(g) attaches to the Secretary's findings of fact also attaches to the inferences reasonably drawn from those facts. *Foss v. Gardner,* 363 F.2d 25, 26 (8th Cir.1966); *Sabbagha v. Celebrezze,* 345 F.2d 509, 510 (4th Cir.1965); *Martlew v. Celebrezze,* 320 F.2d 887, 889 (5th Cir.1963).

Where, as here, the parties to a marriage have been separated for a half-century, there has been no attempt at reconciliation by either party, there has been no contact or correspondence between them, the husband has remarried and lived with his second wife until his death sixteen years later, and the husband has told his sister that he had divorced his first wife, the Secretary as the trier of fact, might conclude logically that there had been a divorce.

With all due respect to my learned colleagues, I do not believe that it was their prerogative to decide this factual issue.